UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SHAWN K. BROWN,

Petitioner,

v.

JEREMY BEAN,[1]

Respondents.

Case No. 3:22-cv-00130-MMD-CSD

ORDER

## I. SUMMARY

This matter is before the Court for review of the merits of Petitioner Shawn K. Brown's Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition" (ECF No. 31)[2]) and his Motion for an Evidentiary Hearing ("Motion" (ECF No. 84)[3]). For the reasons discussed below, the Court denies the Motion, denies the Petition, and grants a certificate of appealability on Grounds 1, 6, 7, and 12.

///

///

///

[1] According to the state corrections department's inmate locator page, Brown is incarcerated at High Desert State Prison. NDOC Inmate Search. The department's website reflects Jeremy Bean is the current warden for that facility. High Desert State Prison (HDSP). The Court will therefore direct the clerk to substitute Jeremy Bean for respondent Gittere, under, *inter alia,* Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Respondents filed their answer (ECF No. 78) and Petitioner filed his reply (ECF No. 83).

[3] Respondents filed a response (ECF No. 85) and Brown filed a reply (ECF No. 86).

## II. BACKGROUND[4]

### A. Facts underlying the offenses

#### 1. Brown was upset that Alofaituli flirted with his ex-girlfriend

Brown and Mi "Amy" Kim dated for two years and broke up about two weeks before May 2016. (ECF No. 50-37 at 54-57.) Kim later told Brown that Kristopher Alofaituli flirted with her and asked her to "be with other people for him." (*Id.* at 58-60, 67.) Kim told Brown that Alofaituli was "just joking" but Kim thought Brown was shocked and a little upset. (*Id.*)

Alofaituli's father, Seuseu ("Larry") Alofaituli, had a friendship with Brown and Kim. (*Id.* at 91-92.) Larry testified that, a week before his son died, Brown was furious and told him that Alofaituli disrespected him by talking to Kim. (*Id.* at 92-94.) Larry told Brown to break up with Kim or he might "end up killing somebody because of her." (*Id.*)

On May 1, 2016, Samantha Aiken went bowling with Brown. (ECF No. 50-36 at 64, 74-75, 85-86.) Brown told Aiken that he felt disrespected because Alofaituli was moving in on his girl. (*Id.* at 65-66.) Brown asked whether Kim and Alofaituli had been together; and Aiken, sensing he was upset, told him nothing had happened yet. (*Id.*)

#### 2. Alofaituli was killed on May 2, 2016

On May 2, 2016, Steven Dunbar was staying at his incarcerated girlfriend's house, which functioned as an open house where people used methamphetamine. (*Id.* at 167.) Emily Nafus arrived at Dunbar's house around 7:00 a.m. that morning, smoked methamphetamine, and observed Alofaituli asleep on the couch right by the front door. (*Id.* at 88-94, 103, 132, 140.) Nafus received a call from Brown asking her for some money, and because Nafus took too long to meet him at a casino to give him the money, he called again asking her to text him Dunbar's address. (*Id.* at 98, 143.)

At some point, Nafus told Brown that Alofaituli was at Dunbar's house. (*Id.* at 96-

[4]The Court summarizes the relevant state-court record solely as background for consideration of the issues in this case. The Court makes no credibility or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Failure to mention a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering the issues.

99, 156-59.) According to Nafus, Brown was angry and told her he did not like Alofaituli. (*Id.* at 103, 156-57.) Nafus met Brown outside Dunbar's front door and gave him the money. (*Id.* at 102.) Brown was angry and Nafus saw him pick up a brick by a tree. (*Id.* at 102-03.) Nafus told Brown, "No" and he replied, "What do you mean, no?" (*Id.*) Brown went inside the house with the brick. (*Id.*) Nafus soon heard a groan and went inside the house where she saw Brown pacing while Alofaituli convulsed on the floor with blood coming out of his head. (*Id.* at 104-05, 124.) She heard Brown say, "grab a sheet to wrap his head." (*Id.*) Nafus followed Brown outside, where he put the brick down, but not in the same place where he had picked it up. (*Id.* at 122-26.) Brown summoned her back inside the house. (*Id.*) After returning inside, Nafus made an excuse and fled the scene. (*Id.* at 107-08.) After she fled, Brown texted her to come back, and called her, apologized that she "had to go see that," and told her not to tell anyone. (*Id.* at 127-28.) She agreed because she was afraid. (*Id.*)

Dunbar testified that on the morning of the incident, he was at his house using methamphetamine. (*Id.* at 176, 179-80.) He was outside at the pool when he heard a commotion, so he went to the front living room where he saw Brown holding a brick above his head "about to come down." (*Id.* at 179-83.) Dunbar yelled, and Brown brought his arms down and apologized. (*Id.* at 185.) Dunbar saw Alofaituli on his back on the floor between the couch and the coffee table, which looked like it had been pushed out a little bit because it was on wheels; Alofaituli was making labored, gurgling, or snoring-like breathing sounds. (*Id.* at 184-85, 189.)

Pardeep Manhas testified he used methamphetamine on the morning of the incident. (ECF No. 50-37 at 34.) He was outside at the back of Dunbar's house when he heard a thumping sound. (*Id.* at 13-14.) He went inside and saw Brown pacing and Alofaituli on the ground but did not see anything in Brown's hands. (*Id.* at 14-17, 20.) He did not see Nafus but saw Dunbar. (*Id.* at 17-19.) Although Alofaituli did not appear to be conscious or awake, and Manhas did not see any injuries, he saw "a lot of blood" and heard Alofaituli make a snoring sound. (*Id.* at 20-21, 29-30.) He heard Brown say in an

"aggressive tone," "Look at you now, that you're sleeping on the floor now." (*Id.*) Manhas was afraid and immediately handed Brown $20 that he owed. (*Id.* at 17-18.) Manhas testified that he kept looking at Dunbar "like, what are we going to do?" (*Id.* at 18-19.)

### 3. Dunbar and Manhas helped Brown move Alofaituli's body

Dunbar and Manhas each testified that, although Brown did not threaten them, they were scared, and they helped Brown wrap Alofaituli in a blanket and move him to the trunk of Alofaituli's Toyota Corolla vehicle, which was backed close to the front door with an open trunk. (ECF Nos. 50-36 at 198, 200, 224, 229, 235-36; 50-37 at 17, 19-26, 50.) At Brown's direction, Dunbar erected a plastic wall that blocked the view of the neighbors and from the street. (ECF No. 50-36 at 193, 195, 197.) Dunbar testified that Alofaituli was still breathing and snoring when they placed him in the trunk, but Manhas testified Alofaituli was not making any noises. (ECF Nos. 50-36 at 209; 50-37 at 26.) Dunbar saw Brown get into the driver's seat of the Corolla and Manhas leave in a separate car. (ECF No. 50-36 at 200-01, 209.) Manhas departed without seeing who drove the Corolla. (ECF No. 50-37 at 26-27.) Dunbar cleaned up the blood, threw out the cleaning materials, and deleted all residential surveillance videos of the incident. (ECF No. 50-36 at 201-02, 207-08.) Kim heard on the news that Alofaituli was missing, asked Brown about him, and Brown told her, "He's gone." (ECF No. 50-37 at 67-75.)

### 4. No forensic evidence tied Brown to the crime

On May 11, 2016, Alofaituli's body was found in the trunk of the Corolla, which was parked in a residential neighborhood in Las Vegas, Nevada. (ECF Nos. 50-36 at 50-54; 50-38 at 28-32.) Alofaituli had suffered a potentially lethal left fracture to the left side of the base of the skull. (ECF No. 50-37 at 112-22.) Due to the advanced decomposition, the precise mechanism of death and time of death could not be determined but a coroner opined the cause of death was blunt-force trauma. (*Id.* at 112, 115-16, 120-22.)

Police notified Larry that Alofaituli's body was found, and Larry told them he suspected Brown and led them to Dunbar's residence. (ECF No. 50-38 at 32-35.) Dunbar consented to a search of the residence, and, despite Dunbar's cleaning efforts, police

located Alofaituli's blood on the bottom of the couch and a couch cushion and apparent blood on the couch and living room floor. (ECF Nos. 50-37 at 157-62, 184-85; 50-38 at 42-43.) Police found a lot of bricks at Dunbar's residence, but no blood on any of them. (ECF No. 50-38 at 66-69, 83-84.) Dunbar directed police to a brick that appeared out of place around a tree in front of the house, police seized it, and a forensic scientist found DNA on that brick that was consistent with at least four individuals, including at least one male, but could draw no conclusions due to limited data. (ECF Nos. 50-37 at 157-62, 184-86; 50-38 at 60-61, 66-68, 81.) A partial DNA sample from the exterior driver door of the Corolla excluded Brown, Alofaituli, and Dunbar, as contributors. (ECF No. 50-37 at 188-90.) There were no identifiable fingerprints on the vehicle. (ECF No. 50-38 at 17-20.)

### B. Procedural summary

#### 1. Brown was convicted by a jury, and the judgment was affirmed

The State charged Brown with three counts: (1) Burglary While in Possession of a Deadly Weapon; (2) First-Degree Kidnapping Resulting in Substantial Bodily Harm; and (3) Murder with Use of a Deadly Weapon. (ECF No. 50-33.) The State noticed an intent to seek punishment as a habitual criminal based on Brown's four prior felony convictions. (ECF No. 50-22.) A jury found Brown guilty of the Murder and Burglary charges but acquitted him of Kidnapping. (ECF No. 32-2 at 2-3.) Brown was sentenced to, among other things, life in prison without the possibility of parole. (ECF No. 51-6 at 3.) The Nevada Supreme Court affirmed the judgment on October 24, 2019. (ECF No. 32-7.)

#### 2. Brown withdrew a state post-conviction petition

While his direct appeal was pending, Brown filed a pro se state petition for a writ of habeas corpus. (ECF No. 51-14.) Brown later moved for an order allowing him to withdraw the petition "without prejudice" so that "upon completion and finality of petitioner's direct appeal, the petitioner may file the necessary, timely and proper writ of habeas corpus with this court." (ECF No. 51-42.) The state court ruled: "[W]e will go ahead and grant his request and withdraw the current petition." (ECF Nos. 51-13 at 6; 51-44 at 3.)

In January 2020, after the judgment was final, the state district court considered Brown's motion for new trial. (ECF No. 52-2 at 3-4.) The state court denied the motion, but noted Brown was "still within the time period to file a writ because he has a remittitur from his direct appeal issued in November of 2019." (*Id.*) The court gave Brown "45 days to convert the ineffective assistance allegations in his motion for new trial into a proper post-conviction writ of habeas corpus." (*Id.*) The court scheduled a status check "to see if he does that," and stated, "if he does, we'll then set a briefing schedule." (*Id.*)

Brown did not convert the motion to a petition; instead, he moved to withdraw the motion for new trial. (ECF No. 52-5 at 3.) The state court ruled Brown had until November of 2020 to file a writ petition because remittitur did not issue on the direct appeal until November of 2019. (*Id.*) The court granted the motion to withdraw the motion for new trial and vacated the status check. (*Id.* at 3-4.) The court stated, "the minutes will just reflect that he's got his whole statutory time period to file the writ, which goes up and through November of this year." (*Id.*) In an order granting the request to withdraw the motion for new trial, the court stated: "COURT ADVISED the Defendant he has until November 21, 2020, the entire salutatory [sic] period to file a Post Conviction Writ." (ECF No. 52-8 at 3.)

**3. Brown's second post-conviction petition was barred**

On November 9, 2020, Brown filed a second state petition for a writ of habeas corpus and a motion to amend claiming he filed a "bare bone" "ghost petition" and requested an attorney amend that petition. (ECF Nos. 32-9; 52-16.) He also filed a motion for appointment of counsel and requested an evidentiary hearing. (ECF No. 52-17.) On November 12, 2020, the state court ordered a response and scheduled a hearing for January 13, 2021. (ECF Nos. 52-18; 52-19.) On December 30, 2020, Brown filed a motion requesting an extension of time to file a reply to the State's response. (ECF No. 52-20.)

On January 13, 2021, the state court held a hearing without Brown's presence. (ECF Nos. 51-13 at 7; 52-22 at 2.) The judge who presided over the hearing was not the same judge who had presided over Brown's trial and earlier post-conviction proceedings. (*Id.*) Without addressing the motion for an extension of time to file a reply, the new judge

rejected the motions and the petition. (ECF Nos. 51-13 at 7; 52-22 at 3.) The state court's findings of fact and conclusions of law, which were drafted by the State at the court's request, rejected the petition because it was illegible, procedurally barred as successive, and there was no good cause to overcome the procedural bar. (ECF No. 52-24 at 4-5.) Brown appealed and the Nevada Court of Appeals affirmed. (ECF No. 52-36.)

## III. MOTION FOR EVIDENTIARY HEARING

Brown moves for an evidentiary hearing to present and develop facts and evidence to support his allegations in Grounds 1 to 5 and 9 to 14 of the Petition. (ECF No. 84 at 2.) He bases his motion on this Court's ruling that exhaustion of his claims is excused because he "was not afforded a full and fair adjudication of his claims" given the "tortured postconviction history of this case." (*Id.* citing ECF No. 69 at 8.) He claims that, because he was not afforded state post-conviction counsel and had no evidentiary hearing in state court, he does not face the barriers to development of the record set forth in 28 U.S.C. § 2254(e)(2) and *Cullen v. Pinholster*, 563 U.S. 170 (2011). (*Id.*) Respondents contend, among other things, that Brown must meet the requirements of 28 U.S.C. § 2254(e)(2) and an evidentiary hearing is unnecessary because the state-court record belies Brown's factual allegations or precludes habeas relief, and new evidence would not support the claims. (ECF No. 85 at 6-8.)

The Court has reviewed the pleadings and exhibits and concludes that, even assuming Brown is eligible for an evidentiary hearing, Brown's claims can be resolved by reference to the state-court record. Brown has not made an adequate showing that, with the benefit of an evidentiary hearing, or consideration of his new evidence, he can develop a factual record that would entitle him to habeas relief. The Court thus denies the Motion. *See Schriro*, 550 U.S. at 474.

## IV. DISCUSSION

The Court reviews Grounds 6 to 8 under 28 U.S.C. § 2254 as those claims were exhausted on state direct appeal. The Court reviews Grounds 1 to 5 and 9 to 14 de novo because the Court previously excused the failure to exhaust the claims and the state

courts did not consider them. (ECF No. 69 at 7-8.) *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011) ("When it is clear . . . that the state court has not decided an issue, we review that question de novo.").

### A. Deferential review of Grounds 6 to 8

#### 1. Governing Standards under AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation

omitted). “A state court’s determination that a claim lacks merit precludes federal habeas relief so long as ‘fairminded jurists could disagree’ on the correctness of the state court’s decision.” *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *See Cullen*, 563 U.S. at 181. Claims not adjudicated on the merits in state court are reviewed *de novo. See Cone*, 535 U.S. at 694.

**2. Ground 6—Prosecutorial Misconduct in Closing**

Brown alleges he was deprived of his right to a fair trial guaranteed by the Fifth, Sixth, and Fourteenth Amendments because (1) no evidence supported the prosecutor’s closing argument that Alofaituli exhibited agonal breathing; (2) no evidence supported the prosecutor’s argument that the coroner concluded Alofaituli was killed with a straight-edged weapon, such as a brick; and (3) the prosecutor misquoted Kim to argue Brown confessed his guilt. (ECF No. 31 at 29-31.) Respondents contend the prosecutor neither misrepresented the evidence nor stated facts not in evidence. (ECF No. 78 at 20-24.)

**a. Standards for Evaluating Prosecutorial Misconduct**

“[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.” *Smith v. Phillips*, 455 U.S. 209, 219 (1982). “The relevant question is whether the prosecutors’ comments ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). “[T]he Supreme Court has emphasized that ‘the *Darden v. Wainwright* standard is a very general one that leaves courts “more leeway ... in reaching outcomes in case-by-case determinations[.]”’” *Rowland v. Chappell*, 876 F.3d 1174, 1189 (9th Cir. 2017) (citing *Parker v. Matthews*, 567 U.S. 37, 48, 132 (2012) (citation omitted)).

A court must judge a prosecutor's remarks "in the context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990). In making that determination, a court looks to various factors: the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation, and whether defense counsel had an adequate opportunity to rebut the comment. *See Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020). Relief is warranted only if misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

Prosecutors have "wide latitude" to argue inferences that are reasonably drawn from the evidence. *See United States v. Young*, 470 U.S. 1, 10 n.7 (1985) (quoting the ABA Standard for Criminal Justice 4-7.8, which provides: "[I]n closing argument to the jury the lawyer may argue all reasonable inferences from the evidence in the record. It is unprofessional conduct for a lawyer intentionally to misstate the evidence or mislead the jury as to the inferences it may draw."). *See also*, *e.g.*, *Ayala v. Chappell*, 829 F.3d 1081, 1115 (9th Cir. 2016) (holding rejection of misconduct claim was not an unreasonable application of *Darden* because prosecutor's statements that several witnesses feared defendant were reasonably drawn from the witnesses' testimony); *United States v. Wilkes*, 662 F.3d 524, 540 (9th Cir. 2011) (holding prosecutor's statements that the Government's witnesses, rather than defendant, told the truth, did not constitute vouching but drew inferences from the evidence and argument that witnesses had no motive to lie and was a permissible response to defense counsel's earlier attacks on the witnesses' credibility); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (holding improper closing argument did not infect trial with unfairness because statements were supported by the evidence and reasonable inferences that could be drawn from that evidence).

///

///

**b. State Court's Determinations**

On direct appeal, the Nevada Supreme Court determined that, based on a casual inspection of the record, the prosecutor's statements were not plainly erroneous:

> Brown also contends the prosecution misrepresented evidence and argued facts not in evidence. We conclude Brown's assignments of error are not plain from a casual inspection of the record. *See Miller v. State*, 121 Nev. 92, 100, 110 P.3d 53, 59 (2005) ("A prosecutor may not argue facts or inferences not supported by the evidence. Nevertheless, the prosecutor may argue inferences from the evidence and offer conclusions on contested issues." (internal quotation marks and footnotes omitted)).

(ECF No. 61-46 at 4 n.2.)

Brown requests this Court conduct de novo review of Ground 6 because he claims the Nevada Supreme Court did not wrestle with the test articulated in *Darden*. (ECF No. 83 at 52-54.) A state court need not cite Supreme Court cases nor even be aware of them so long as neither the reasoning nor the result of the state-court decision contradicts them. *See Early v. Packer*, 537 U.S. 3, 8 (2002). Brown also contends de novo review is appropriate because the Nevada Supreme Court's underlying premise that his assignments of error are "not plain from the casual inspection of the record" is based on an unreasonable determination of the facts. (ECF No. 83 at 52-53.) As explained below, the Nevada Supreme Court's determinations are neither contrary to, nor constitute an unreasonable application of, clearly established federal law as determined by the Supreme Court, and are not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

**c. Agonal Breathing[5]**

Dunbar testified Alofaituli had "labored breathing or like gurgling or snoring like. It was like a real labored breathing." (ECF No. 50-36 at 189, 209.) Manhas testified he heard Alofaituli making "like a snoring sound." (ECF No. 50-37 at 21, 39.) Dr. Roquero could not state exactly how long Alofaituli survived after his head injury because it could have taken

[5] "'Agonal' means '[p]ertaining to the period immediately preceding death; usually a matter of minutes but occasionally indicating a period of several hours.'" *Russell v. Lumitap*, 31 F.4th 729, 736 n.4 (9th Cir. 2022) (citing *Agonal, Blakiston's Gould Medical Dictionary* (3d ed. 1972)).

10-15 seconds, minutes, or hours, for him to die. (*Id.* at 121, 129-30, 134.)

The jury was instructed to base its decision on the evidence and that it "must bring to the consideration of the evidence your everyday common sense and judgment as reasonable men and women," and may "draw reasonable inferences from the evidence which you feel are justified in the light of common experience, keeping in mind that such inferences should not be based on speculation or guess." (ECF No. 50-40 at 40.)

The prosecutor argued in closing that Dunbar saw Alofaituli "on the ground bleeding and snoring." (ECF No. 50-41 at 26.) The prosecutor argued those with experience with death might know it as "agonal breathing":

> Snoring is in quotations because while some—everyone comes from different walks of life. Some of you may have experience with death, unfortunately. Snoring or agonal breathing is common in a significant blow like this. So he would describe it as snoring; some of us may know it as agonal breathing.

(*Id.*)

Based on the testimony and evidence about Alofaituli's breathing, his injury, his death, and the jury instructions, the jury could draw a reasonable inference that Alofaituli exhibited agonal breathing. *See Ayala*, 829 F.3d at 1115. Accordingly, the Nevada Supreme Court was not objectively unreasonable in its conclusion that the prosecutor's argument did not misrepresent the evidence or argue facts outside the evidence. Ground 6(A) is therefore denied. *See* 28 U.S.C. § 2254(d).

**d. Prosecutor's Argument Regarding Brick as the Weapon**

Based on the testimony of Nafus and Dunbar, Brown was seen holding a brick moments before and after Alofaituli was seen bleeding on the floor. (ECF No. 50-36 at 102-03, 180-83.) Dr. Roquero opined that, based on the photographs of Alofaituli's skull, which showed a "linear" fracture in the left temporoparietal region and another fracture in the frontal region, the cause of death was blunt-force trauma. (ECF No. 50-37 at 112, 115-16, 122.) Roquero saw nothing that correlated the injury to a brick; however, he did not personally examine the body. (*Id.* at 126-28.) Detective Long attended the autopsy with Dr. Timothy Dutra who performed it. (ECF No. 50-38 at 31-32.) Long testified that,

according to Dutra, the head fracture appeared “to be linear, meaning that whatever struck him had a straight edge to it, and it went front to back and then down to the base of the skull.” (*Id.*)

The prosecutor argued in closing that the cause of Alofaituli’s death was a “giant skull fracture across the left side of the head” and “this lateral injury” is consistent with a weapon that “has a straight edge like a brick.” (ECF No. 50-41 at 13, 35-36.) The defense argued in closing that there was no testimony about “any sort of correlation with a brick and how that could have affected the injury” and Roquero “agreed that he can’t testify with any stretch of the imagination as to the fact that this was done by a brick.” (*Id.* at 60-62.) The defense argued Roquero identified no dust or gravel-like substances to draw such a correlation. (*Id.*) And the defense argued there was no blood on the brick and no DNA evidence linking Brown to the brick. (*Id.* at 62-64.)

Given this record, and the instruction to the jury (ECF No. 50-40 at 40), the jury could draw a reasonable inference that a brick was the murder weapon. *See Ayala*, 829 F.3d at 1115. Thus, the Nevada Supreme Court’s determination that the prosecutor did not misrepresent or misstate the evidence is not based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings and is neither contrary to, nor constitutes an unreasonable application of, clearly established federal law. Accordingly, Ground 6(B) is denied. *See* 28 U.S.C. § 2254(d).

**e. Argument Regarding Kim’s Testimony**

Kim testified that, after learning Alofaituli was missing, she asked Brown what happened to Alofaituli, and Brown replied, “He’s gone.” (ECF No. 50-37 at 67-75.) The prosecutor asked Kim whether Brown apologized and said, “He’s gone, baby, I’m sorry,” and Kim testified she “thought so,” but “[i]t was a long, long time ago” and she did not recall “verbatim what Brown said,” “but it was something like that.” (*Id.*)

The jury was instructed that “whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be . . ..” (ECF No. 50-40 at 44.)

The prosecutor argued Brown's statement indicated consciousness of guilt:

> And another important thing that she said is what the defendant told her after the fact. Within a day of [Alofaituli] being murdered, he says, I'm sorry, but he's gone. Now, if "I'm sorry" doesn't indicate to you consciousness of guilt, I don't know what does. That's a confession to his own girlfriend. That's an admission of guilt to his own girlfriend. She thought he was joking, of course, but we all know he wasn't.

(ECF No. 50-41 at 21.)

Considering the instruction and testimony, the jury could draw a reasonable inference that Brown's statement exhibited consciousness of guilt. *See Ayala*, 829 F.3d at 1115. Therefore, the Nevada Supreme Court's determination that the prosecutor did not misrepresent or misstate the evidence is not based on an unreasonable determination of fact and is neither contrary to nor constitutes an unreasonable application of clearly established federal law. Ground 6(C) is denied. *See* 28 U.S.C. § 2254(d).

**3. Ground 7—Prosecutorial Vouching for Witness Credibility**

Brown alleges he was deprived of a fair trial because the prosecutor repeatedly vouched for the credibility of witnesses. (ECF No. 31 at 31-34.) Respondents contend the prosecutor's arguments were based on the witness's testimony and did not reflect the prosecutor's personal opinions. (ECF No. 78 at 25-27.)

**a. Governing Standards**

Prosecutors may not give personal opinions about the evidence as it "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *See Young*, 470 U.S. at 18-19 (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)). "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). There is "no bright-line rule about when vouching will result in reversal." *Id.* at 1278. A court must consider factors including: the form of vouching; how much the vouching implies the prosecutor has extra-record knowledge of or the capacity to monitor the

witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony; and the vouching to the case overall. *Id.*

**b. State Court's Determinations**

On direct appeal, the Nevada Supreme Court, applying plain error review, determined the prosecutor's arguments included improper endorsements, but did not warrant reversal:

> Brown argues the prosecution committed misconduct by vouching for witnesses' credibility.
>
> . . . .
>
> "When considering claims of prosecutorial misconduct, this court engages in a two-step analysis. First, we must determine whether the prosecutor's conduct was improper. Second, if the conduct was improper, we must determine whether the improper conduct warrants reversal." *Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008) (internal footnotes omitted). Because Brown failed to object, reversal is only warranted if he demonstrates plain error that affected his substantial rights. *Id.* at 1190, 196 P.3d at 477.
>
> Here, Brown contends the prosecution offered improper assurances of witnesses' credibility. We agree. During closing argument, the prosecution repeatedly recounted facts supporting the credibility of an individual witness, and then commented, "if that doesn't tell you [the witness is] credible, I don't know what does." These and similar comments by the prosecution strayed from proper argument to improper endorsement.
>
> > [FN 3] The prosecution made additional comments that endorsed witnesses, "[t]hat tells you she's credible beyond a reasonable doubt," "you can trust his credibility," "I can tell you why she's further credible," "[b]ecause he's telling you the truth."
>
> *See Collier v. State*, 101 Nev. 473, 480, 705 P.2d 1126, 1130 (1985) ("[B]y invoking the authority of his or her own supposedly greater experience and knowledge, a prosecutor invites undue jury reliance on the conclusions personally endorsed by the prosecuting attorney."), *holding modified by Howard v. State*, 106 Nev. 713, 800 P.2d 175 (1990). However, these comments alone do not warrant reversal. *See Leonard v. State*, 117 Nev. 53, 81, 17 P.3d 397, 414 (2001) ("A prosecutor's comments should be considered in context, and 'a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.'" (quoting *United States v. Young*, 470 U.S. 1, 11 (1985))).

(ECF No. 61-46 at 4-5.)

Brown alleges the Nevada Supreme Court's decision is contrary to *Darden* and it failed to consider whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process" as required by *Darden*. (ECF No. 83 at 58-59.) As explained above, a state court need not cite Supreme Court cases or even be aware of Supreme Court cases so long as neither the reasoning nor the result of the state-court decision contradicts them. *See Early*, 537 U.S. at 8. Here, the Nevada Supreme Court relied on *Young*. In *Young*, the Supreme Court explained not only that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," but went on to state in that same sentence that "the statements or conduct must be viewed in context[,]" and "only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young*, 470 U.S. at 11. The Nevada Supreme Court's determination that it would not reverse based on the prosecutor's comments "alone" necessarily means that, although it concluded the remarks were improper, it also understood that, in accordance with *Darden*, relief was not warranted because the improper remarks did not render the trial unfair. *See id.* And, as explained below, the state court's determination is objectively reasonable.

The trial evidence reveals no express confession to police and no physical evidence connecting Brown to the crime. Thus, the parties and the jury understood the State relied on the credibility and believability of witnesses who testified to circumstantial evidence to prove the charges, and both parties probed the credibility of the witnesses during testimony. In closing the defense argued there were no witnesses who testified under oath as to what happened to Alofaituli and there was not one "independent witness," "not one person that doesn't have a dog in the fight" who could corroborate one thing that Dunbar, Manhas, and Nafus, told the jury. (ECF No. 50-41 at 52-55.) The prosecutor argued that, based on the evidence, the witnesses were credible because they either lacked motivation to lie, or acted or testified against their personal best interests. As detailed below, considering the context of the prosecutor's remarks, the evidence, the jury instructions, the defense arguments, and the context of the entire trial, the Nevada

Supreme Court was objectively reasonable in drawing its conclusion that the prosecutor's remarks regarding witnesses Kim, Larry, Dunbar, Manhas, and Nafus, and examination of Detective Long, whether analyzed individually or collectively, did not so infect the trial with unfairness as to constitute a due process violation. *See* 28 U.S.C. § 2254(d); *Darden*, 477 U.S. at 181.

**c. Kim**

The jury was instructed that, in evaluating the believability or credibility of the witnesses, it should consider the witness's "relationship to the parties." (ECF No. 50-40 at 37.) The jury was also instructed that the "[s]tatements, arguments and opinions of counsel are not evidence in the case." (*Id.* at 36.) And the jury was instructed that "whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be . . .." (*Id.* at 44.)

Brown alleges the prosecutor vouched for Kim by arguing "[a]nd this is his girlfriend, so she has no reason to inculpate him or make him look more guilty. She did, but she has no reason to fabricate that, right?" (ECF No. at 31 at 32; *see also* ECF No. 50-41 at 20). The prosecutor prefaced that argument by pointing to Kim's testimony that she was still Brown's girlfriend and was still in contact with him. (*Id.*)

The prosecutor's argument neither placed the government's prestige behind Kim through personal assurances of her veracity, nor implied the prosecutor had extra-record knowledge of or the capacity to monitor her truthfulness. In the context of the trial, the argument that Kim made Brown appear guilty constituted a reasonable inference that could be drawn from the evidence, and not a statement of personal opinion. *See id.* The Nevada Supreme Court was reasonable to conclude the prosecutor's remark did not render the trial unfair.

**d. Larry**

Larry testified he was not only Alofaituli's father but had been Brown's friend. (ECF No. 50-37 at 91-92.) The jury was instructed it should evaluate the believability or

credibility of a witness based on their motives and "relationship to the parties" and the opinions of counsel are not evidence to be considered in the case. (ECF No. 50-40 at 36-37.) Brown alleges the prosecutor vouched for Larry by arguing that Larry

> [t]old you he was [Brown]'s friend. In fact, he was the one who introduced [Alofaituli] and [Brown], or he was the center of how they met. He was also friends with [Kim], which goes to why would he come up here and tell you something that's not true about [Brown]. [Brown]'s his friend, he told you that, or he was until he found out he murdered his kid.

(ECF No. 31 at 32; *see also* ECF No. 50-41 at 21.)

The prosecutor's remarks about Larry's lack of motivation to lie constitute a reasonable inference that could be drawn from the evidence. The argument did not place the government's prestige behind Larry through personal assurances of his veracity or convey that the prosecutor had extra-record knowledge of or the capacity to monitor his truthfulness. The Nevada Supreme Court was reasonable to conclude the prosecutor's remark about Larry's lack of motivation to lie did not render the trial unfair.

**e. Dunbar**

Brown contends the prosecutor vouched for Dunbar in four ways. First, Brown contends the prosecutor vouched by arguing: "He told you under oath he put him in the trunk, or he helped put him in the trunk, and he was still breathing. He told you under oath that he destroyed evidence. I mean, if that doesn't tell you that what he's saying is believable, I don't know what does." (ECF No. 31 at 32; *see also* ECF No. 50-41 at 26) The prosecutor followed that remark by arguing that Dunbar "came in here and told you he wiped up blood from a murder scene, that he deleted the tape." (ECF No. 50-41 at 26.) Second, Brown contends the prosecutor vouched by arguing, "I mean, if that doesn't tell you that what Steven Dunbar said on the witness stand is credible, I don't know what does." (ECF No. 31 at 32; *see also* 50-41 at 27.) The prosecutor prefaced that argument by recounting Dunbar's testimony that he "helped get them out and he cleaned up what was left behind," "he put [Alofaituli]'s shoes above the washer, and a week later or whatever it was he said, he gave them away, he ditched them." (ECF No. 50-41 at 27.) Third, Brown contends the prosecutor vouched by arguing, "The guy rode his bike to the

station to come clean. If that doesn't tell you he's credible, I don't know what does. He gave consent to go into his flophouse, tear it up, and get the evidence that we ultimately got. If that doesn't tell you he's credible, I don't know what does. He gave consent to give a DNA swab. If that doesn't tell you he's credible, I don't know what does." (ECF No. 31 at 32; *see also* ECF No. 50-41 at 27.) And finally, Brown contends the prosecutor vouched by arguing, "Steven Dunbar . . . said [Alofaituli] was still breathing. You put a live body into the trunk of a car, that's something you remember, ladies and gentlemen. You can trust his credibility and how he came across to you and if you felt that that was sincere, but that's something that he remembered, and that is felony murder." (ECF No. 31 at 32; *see also* ECF No. 50-41 at 87.)

The prosecutor's arguments about Dunbar's credibility were in reasonable anticipation of the defense closing arguments. Defense counsel's closing remarks directed the jury to the instruction on witness credibility and argued the prosecution wanted the jury to believe Dunbar when he inculpated Brown, but ignore that Dunbar lied to police, was inconsistent, was high at the time of the incident, covered up the crime, and even destroyed surveillance and other evidence. (ECF No. 50-41 at 49, 52-57, 63-65.)

Based on the context of the trial, the prosecutor's closing arguments were grounded in the evidence and reasonable inferences that could be drawn from the evidence concerning Dunbar's believability or credibility. The prosecutor's argument did not convey the prosecutors had extra-record knowledge of or the capacity to monitor Dunbar's truthfulness. To the extent the prosecutor's argument may be perceived as conveying the personal opinions of the prosecutor, the jury was instructed that the opinions of counsel are not evidence to be considered in the case. Even if some of the statements were improper endorsements, the Nevada Supreme Court was reasonable to conclude that, in the context of the trial, and given that Dunbar's credibility was hotly contested, the prosecutor's remarks about Dunbar's credibility did not render the trial unfair.

**f. Manhas**

Brown alleges the prosecutor vouched for Manhas in two instances. First, Brown alleges the prosecutor vouched for Manhas by arguing, Manhas, "admitted, we put [Alofaituli] in the trunk. Under oath, he admitted he put a dead or dying body into a trunk of a car. If that doesn't tell you he's credible, I don't know what does." (ECF No. 31 at 32; *see also* ECF No. 50-41 at 28.) Second, Brown contends the prosecutor vouched for Manhas by arguing, "if this is some big frame job . . . why doesn't [Manhas] say, yep, I saw the murderer get into the car and drive off with the body? Because he's telling the truth. Because he's telling you the truth . . . If that doesn't tell you he's credible, I don't know what does." (ECF No. 31 at 33; *see also* ECF No. 50-41 at 29.) The prosecutor prefaced the remarks about Manhas's credibility by arguing:

> [Manhas], frankly is a jerk. No one's hiding that. I mean, you saw his demeanor on the stand. Probably not someone you want to hang out with, and me neither, but he was consistent with what [Dunbar] said as well. Five people in the house. [Alofaituli] was tired, sleeping on the couch. [Nafus] got a phone call, [Brown] seemed mad, I didn't know [Brown] was mad at [Alofaituli].

(ECF No. 50-41 at 27.) The prosecutor then argued that Manhas's testimony was consistent with Dunbar's testimony, including that Manhas helped put the body in the trunk of the car, except that Manhas did not see a brick in Brown's hands. (*Id.* at 28-30.)

The prosecutor's remarks were grounded in the evidence and reasonable inferences that could be drawn from the evidence concerning Manhas's believability or credibility. The prosecutor's arguments about Dunbar's credibility also anticipated the defense closing arguments. Defense counsel argued Manhas admitted he ultimately assisted in putting Alofaituli in a trunk, did not see a brick, did not report it, had a lawyer present when he spoke with the police, and did not supply his DNA. (*Id.* at 58, 63, 68.) In the context of the entire trial, the prosecutor's argument did not place the government's prestige behind Manhas through personal assurances of his veracity and did not convey the prosecutors had extra-record knowledge of or the capacity to monitor his truthfulness. To the extent the remarks conveyed the prosecutor's personal opinion about Manhas's

credibility, the jury was instructed the opinions of counsel are not evidence to be considered in the case. The Nevada Supreme Court was reasonable to conclude the prosecutor's remarks about Manhas's credibility did not render the trial unfair.

**g. Nafus**

Brown contends the prosecutor vouched for Nafus in two instances. (ECF No. 31 at 33.) He argues the prosecutor vouched for Nafus by arguing:

> So she's been in prison all this time, she's on parole, and he would have you believe that she got under oath and lied in front of a jury while on parole? That's ballsy, excuse my language, but come on. Her testifying in and of itself shows you she's credible, but I can tell you why she's further credible. She's consistent with the first two, with [Dunbar] and [Manhas], that there are [sic] the same people present.

(*Id. See also* ECF No. 50-41 at 30.) That argument was prefaced by:

> Think about [Nafus]. [Defense counsel] made a big point of cross-examining her on her criminal conviction, the drug charge, and he got into her being in prison, and she was just—you were just in prison until recently when you got out and came here at the State's expense and got a hotel room. Remember that line of questioning?

(ECF No. 50-41 at 30.) Second, Brown argues the prosecutor vouched for Nafus by arguing, "That tells you she's credible beyond a reasonable doubt." (*Id.* at 33.) That argument followed the following argument:

> [Alofaituli] didn't wake up. The only time [Alofaituli] uttered a word throughout the course of this whole morning was to—when [Nafus] walked in and he said, I like your shoes, and he fell back asleep. Remember that? That's huge. [Nafus] did not come up with that. That is not fabricated. That is not some plot. That is her recalling her friend said or her acquaintance said, I like your shoes, and closed his eyes. That tells you she's credible beyond a reasonable doubt.

(*Id.*) Defense counsel argued Nafus was under the influence and did not see what happened inside the house. (*Id.* at 65.)

The prosecutor's remarks were grounded in the evidence and reasonable inferences that could be drawn from the evidence concerning Nafus's believability or credibility. The opening remarks were made in reasonable anticipation of defense counsel's closing argument about Nafus's credibility. And the jury was instructed it should evaluate the believability or credibility of a witness based on their motives and

"relationship to the parties." The prosecutor's argument did not convey the prosecutors had extra-record knowledge of or the capacity to monitor Nafus's truthfulness. To the extent the remarks conveyed the prosecutor's personal opinion about Nafus's credibility, the jury was instructed that the opinions of counsel are not evidence to be considered in the case. The Nevada Supreme Court was reasonable to conclude the prosecutor's remarks about Nafus's credibility did not render the trial unfair.

#### h. Detective Long

Brown alleges the prosecutor vouched for its witnesses through the testimony of Detective Dan Long. (ECF No. 31 at 32 citing ECF No. 50-38 at 64-65 and 100-01). The prosecutor asked Long whether there were discrepancies throughout the statements of Dunbar, Manhas, and Nafus, and Long responded:

> Trauma does things to people. If everything was consistent in all the witnesses that we interview on any homicide, that's a red flag. That's a rehearsal. If there are inconsistencies, it makes sense. People will never have the same viewpoint or the same view, or fear, or anything from an event, so they have to be different. That's a key in investigation.

(ECF No. 50-38 at 65.) Long's testimony does not vouch for the witnesses; it explains that discrepancies in accounts of the same event can arise because different witnesses have different perceptions of the same event. The jury was instructed that it was not limited solely to what it saw and heard as the witnesses testified but could draw reasonable inferences from the evidence in light of common experience. Finally, the parties each argued in closing that the similarities and discrepancies in the testimony of the three primary witnesses, and their motivations, either undermined or enhanced their credibility. (ECF No. 50-41 at 23-35, 48-60, 63-65, 73-74, 79-80, 84-85.)

Brown claims the prosecutor vouched through Detective Long's testimony confirming that Nafus, Dunbar, and Manhas, were consistent "in the fact that a phone call comes in from the defendant whereby he's angry," "there's consistency that he's angry at [Alofaituli] because of a girl named [Kim]," and that Alofaituli was "laying on that couch asleep" when Brown entered the house. (ECF No. 31 at 32; *see also* ECF No. 50-38 at 100-01.) Long, however, also confirmed the witnesses were consistent in their story that

they did not see Brown strike Alofaituli. (ECF No. 50-38 at 101.) Long's testimony was also subject to cross-examination. And the jury was instructed it had a duty to be governed in its deliberation by the evidence, i.e., the witnesses' testimony, as it understood it and remembered it to be. Even assuming arguendo that Long vouched for the eyewitnesses, the Nevada Supreme Court's determination, that the examination of Long did not so infect the trial with unfairness as to violate due process, was objectively reasonable.

In sum, the Court denies Ground 7 because the Nevada Supreme Court's determination is neither contrary to, nor constitutes an unreasonable application of, clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d).

### 4. Ground 8—Instruction on Felony-Murder

Brown alleges his right to due process was violated by the trial court's instruction to the jury on the felony-murder rule. (ECF No. 31 at 34-35.) He claims the Nevada Supreme Court's contemporary interpretation of Nevada's felony-murder statute, NRS § 200.030(1)(b) is incorrect and improperly relieved the State of its burden to prove malice. (*Id.*) Respondents argue the instruction accurately stated the law at the time it was given and the prosecution proved malice beyond a reasonable doubt. (ECF No. 78 at 28.)

#### a. Governing Standards

"The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364-65 (1970). Federal habeas relief is warranted only if an instruction "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (explaining that, according to *Donnelly*, 416 U.S. at 643, "'[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]'"). When reviewing an ambiguous instruction, the inquiry is whether "there is a reasonable likelihood that the jury has applied the challenged

instruction in a way that violates the Constitution." *Id.* (citing *Boyde*, 494 U.S. at 380). "[I]nstructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions." *Jones v. United States*, 527 U.S. 373, 391 (1999).

In Nevada, murder is defined as the unlawful killing of a human being with malice aforethought, either express or implied. NRS § 200.010(1). As relevant here, first-degree murder can be committed in two ways: (1) perpetrated by means of poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing; or (2) committed in the perpetration or attempted perpetration of certain enumerated felonies, including robbery, kidnapping, burglary, arson, rape, and related crimes. NRS § 200.030(a) and (b). For first-degree felony-murder, the felonious intent involved in the underlying felony is deemed, by law, to supply the malicious intent necessary to characterize the killing as a murder, and because felony murder is defined by statute as first-degree murder, no proof of the traditional factors of willfulness, premeditation, or deliberation, is required for a first-degree murder conviction. *See Sanchez-Dominguez v. State*, 318 P.3d 1068, 1076 (Nev. 2014); *State v. Contreras*, 46 P.3d 661, 662 (Nev. 2002).

**b. Additional Background**

In Brown's case, Instruction 2 informed the jury "not to single out any certain sentence or any individual point or instruction and ignore the others," but "to consider all the instructions as a whole and regard each in the light of all the others." (ECF No. 50-40 at 3.) Instruction 3 informed the jury that "[e]ach charge and the evidence pertaining to it should be considered separately. The fact that you may find a defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other defendant or offense charged." (*Id.* at 5.) Instruction 11 informed the jurors that the Indictment alleged "an open charge of murder," which "may include murder of the first degree and murder of the second degree." (*Id.* at 13.) Instruction 12 explained that "[m]urder is the unlawful killing of a human being with malice aforethought, either express or implied." (*Id.* at 14.) Instruction 19 provided the Nevada felony-murder rule:

> There is a kind of murder which carries with it conclusive evidence of premeditation and malice aforethought. This class of murder is murder

> committed in the perpetration or attempted perpetration of a kidnapping and/or burglary. Therefore, a killing which is committed in the perpetration or attempted perpetration of a kidnapping and/or burglary is deemed to be Murder of the First Degree, whether the killing was intentional or unintentional or accidental. This is called the Felony-Murder Rule.
>
> The intent to perpetrate or attempt to perpetrate kidnapping and/or burglary must be proven beyond a reasonable doubt.
>
> For the purposes of the Felony-Murder Rule, the intent to commit the kidnapping and/or burglary must have risen before or during the conduct resulting in death. However, in determining whether the Defendant had the requisite intent to commit kidnapping and/or burglary before or during the killing, you may infer that intent from the Defendant's actions during and immediately after the killing. There is no Felony-Murder where the kidnapping and/or burglary occurs as an afterthought following the killing.

(*Id.* at 21.) The jury was also instructed that "[a]ll murder which is not Murder of the First Degree is Murder of the Second Degree," and "Murder of the Second Degree is Murder with malice aforethought, but without the admixture of premeditation and deliberation." (*Id.* at 23.) Instruction 25 explained lesser-included offenses:

> When a person is accused of committing a particular crime and at the same time and by the same conduct may have committed another offense of lesser grade or degree, the latter is with respect to the former, a lesser included offense.
>
> If you are not satisfied beyond a reasonable doubt that the defendant is guilty of an offense charged, he may, however, be found guilty of any lesser included offense, if the evidence is sufficient to establish his guilt of such lesser offense beyond a reasonable doubt.
>
> As charged in this case, the offense of First Degree Murder necessarily includes the lesser offenses of Second Degree Murder and Voluntary Manslaughter.
>
> Therefore, if you find beyond a reasonable doubt that a First Degree Murder was committed, then the appropriate verdict is First Degree Murder.
>
> However, if you all find beyond a reasonable doubt that a Murder was committed but you have a reasonable doubt as to whether the Murder was in the First Degree or the Second Degree, then you must give the defendant the benefit of that doubt and return a verdict of Second Degree Murder.
>
> Likewise, if you have a reasonable doubt as to whether a Murder was committed but you all agree beyond a reasonable doubt that a Voluntary Manslaughter was committed, then you must give the defendant the benefit of that doubt and return a verdict of Voluntary Manslaughter.

(*Id.* at 27.)

During deliberations, the jurors sent two notes to the court concerning the instructions, and the defense agreed the court should not respond with further instructions or direct the jury to any particular instructions:

> THE COURT: [W]e had a couple of questions that came out from our jurors while they were deliberating and I talked to the attorneys on the phone and explained what was going on and there was some agreement, or basic agreement, I'll let you all state whatever the objections were, to the language that I sent back to them.
>
> The first note that came out, I informed the attorneys that the foreperson delivered a note to the marshal and said to the marshal that he really just needed to talk to the judge because he couldn't explain what it was that they wanted. So I read the note and, sure enough, it was really unclear. It said, quote, "If we agree to Count 1, number 1 or number 2," which I had no idea what number 1 or number 2 was, "is felony murder the only choice per Instruction 19 or does number 3 hold relevance and Instruction 25?" So I had my marshal convey to him that, number one, I can't talk to him. He needs to kind of spend some time writing out exactly what it is they need me to know, and please don't use numbers other than for the counts or the instructions because I didn't know what his numbers meant.
>
> And so they went back with that information and then they sent out note number 2. And note number 2 said, "If we find the defendant guilty of burglary with a deadly weapon, do we then have an option of a lesser-included charge with murder as per Instruction 25, lines 12 through 15? Instruction 19 requires first degree murder if we find the defendant guilty of burglary with a deadly weapon. The last paragraph of Instruction 3, lines 6 through 8, says we can find each charge to be considered separately."
>
> So the information I sent 'em back that I had run by the attorneys said, "You are correct in that Instruction Number 3 informs you that the law provides that each charge and the evidence pertaining to it should be considered separately. While you've also referenced Instructions 25 and 19, I will remind you that as stated in Instruction Number 2, you are to consider all the instructions as a whole and regard each in the light of all the others." Good?
>
> [THE STATE]: Yes, Your Honor.
>
> [DEFENSE COUNSEL]: Okay. Okay. Yeah, that sounds good. So you never specifically told them to go back and read 19 and 25?
>
> THE COURT: No, I—
>
> [DEFENSE COUNSEL]: Right.
>
> THE COURT: —what I, remember what I said on the phone was I'm not going to direct them—
>
> [DEFENSE COUNSEL]: Yes.
>
> THE COURT: —to a specific instruction. I'm just going to tell them that while

> you also reference those other two, I'm going to remind you that you have to look at all the instructions as a whole and regard each in the light of all the others. And I think, you know, one of the reasons I did that is particularly within a homicide case you've got probably 10 to 12 instructions that are all somewhat interrelated if you're dealing with premeditation and deliberation, first degree murder, second degree murder, voluntary manslaughter, lesser-includeds, and in my opinion at least, they need to be told to make sure they're considering all of them together.
>
> So I think the State wanted me more specifically to direct them back to the two that they referenced. And you, [defense counsel], were of the mindset, no, I don't want them directed to anything in particular, but you agreed with the admonition to them about looking at all the instructions.
>
> [DEFENSE COUNSEL]: That's fine.

(ECF No. 50-43 at 3-5.)

**c. Analysis of Ground 8**

On direct appeal, the Nevada Supreme Court found the instructions correctly stated the law and declined to reconsider Nevada's felony-murder jurisprudence:

> Brown argues that instructing the jury on the felony-murder rule violated his fundamental rights. We disagree. Failure to object to a jury instruction precludes all but discretionary plain error review. *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003). The felony-murder rule has long been recognized under Nevada law. *E.g.*, *Collins v. State*, 133 Nev. 717, 405 P.3d 657 (2017); *State v. Gray*, 19 Nev. 212, 8 P. 456 (1885). After reviewing the record, we discern no misstatements of the law in the instructions provided to the jury. Therefore, we conclude that error cannot be assigned to the district court for accurately instructing the jury pursuant to Nevada law. *See* NRS 175.161(3) ("If the court believes that the charge is pertinent and an accurate statement of the law . . . it must be given.").
>
> . . . .
>
> To the extent Brown invites this court to reconsider the entirety of our felony-murder jurisprudence, we decline the offer.

(ECF No. 61-46 at 5-6 (footnote omitted).)

Brown contends the Nevada Supreme Court erroneously interpreted Nevada's felony-murder statute, NRS § 200.030(1)(b), and, because of that misinterpretation, the instructions given to Brown's jury confused the jury and relieved the State of the burden to prove malice. (ECF No. 31 at 34-35.) Brown's contention lacks merit because federal habeas corpus relief is not available for errors of state law. *See Estelle*, 502 U.S. at 67 (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) and *Pulley v. Harris*, 465 U.S. 37, 41

(1984)). It is not the province of the federal courts to re-examine state court determinations of state law questions. *See id.* at 67-68. Federal courts accept a state court's interpretation of state law "and alleged errors in the application of state law are not cognizable in federal habeas corpus." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). "[A] petitioner may not . . . transform a state-law issue into a federal one merely by asserting a violation of due process." *Id*. Moreover, Brown has not established the instructions, read together, were ambiguous or a reasonable likelihood the jury applied the felony-murder instruction in a way that violates the Constitution. The instructions on felony-murder and lesser-included crimes are clear when read in conjunction with the other instructions. And the jury's questions, together with the instructions, reveal the jury was not confused by the instructions; rather, it appears the jury understood them. Accordingly, Ground 8 is denied as the Nevada Supreme Court's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d).

### B. De Novo Review of Grounds 1 to 5 and 9 to 14

#### 1. Standards for Evaluating Ineffective Assistance of Counsel (IAC)

A petitioner claiming IAC has the burden to demonstrate (1) the attorney made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *See Williams*, 529 U.S. at 390-91 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To establish ineffectiveness, the defendant must show counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, to avoid the distorting effects of hindsight. *See id.* at 689. The petitioner bears the burden to overcome the presumption

that counsel's actions might be considered sound trial strategy. *See id.* An attorney must make a reasonable investigation in preparation for trial, or a reasonable decision not to investigate. *Strickland*, 466 U.S. at 691. To establish prejudice, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *See Harrington*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693.)

**2. Ground 1—IAC—Additional Mitigation Evidence**

Brown alleges trial counsel failed to adequately present at sentencing evidence that Brown suffered trauma and abuse over the course of his life, including the following details: (1) he grew up in squalor; (2) his mother punched out his baby teeth, chased him with a knife, knocked him unconscious with a frying pan, and beat him, including in front of friends; (3) his mother and stepfather left him tied to a post overnight, publicly beat him in front of his classmates, went away leaving him in charge of his four siblings, sadistically punished him, supplied him with alcohol and drugs from a young age, and took his possessions; (4) his stepfather kicked him out of the house; (5) he was molested by his mother's friend and punished for the abuse; (6) he witnessed his parents fight constantly; (7) he saw his mother stab his stepfather; (8) he saw his mother abuse other children; (9) his parents supplied him with drugs and alcohol and he used it to cope; (10) he experienced trauma and substance abuse that is reflected in his academic performance; and (11) he tried to pursue a career as a professional fighter. (ECF No. 31 at 8-25.) Respondents contend these topics were covered by counsel, Brown, the PSI, and letters supporting Brown. (ECF No. 78 at 11.) They further contend Brown cannot establish prejudice because, although the trial court was sympathetic to Brown's upbringing and addiction, it did not overcome the strong evidence of guilt. (*Id.*)

**a. Background**

During trial, the parties alerted the court that, should the jury return a verdict of

guilty, Brown would waive a penalty phase and ask the court to impose sentence. (ECF No. 50-38 at 3-4.) Defense counsel explained that he and Brown had considered this "throughout the case," it was always in the back of counsel's mind, and "he's not from here, so we didn't really have much to present anyways." (*Id.*) Counsel further explained, "I will be honest, that that is obviously what is factoring into my decision—on that, that we don't exactly have his family and other people to essentially counter some things that we believe would be presented." (*Id.*)

After the verdict, a Presentence Investigation Report (PSI) was prepared. (ECF No. 53-1.) The PSI recommended imposition of the maximum sentence of life imprisonment without the possibility of parole for the Murder conviction, with a consecutive sentence of 96 to 24 months for the Deadly Weapon enhancement, and 66 to 180 months for the Burglary conviction. (*Id.* at 9-10.) Regarding Brown's childhood, the PSI stated: "Mr. Brown's childhood was described as hard. He never knew his father, and he grew up in a household raised by his mother who was a drug addict. Mr. Brown was physically abused by his mother and stepfather during his childhood." (*Id.* at 3.) Regarding education, the PSI conveyed that Mr. Brown completed the 9th grade at Maui High School in 1990 and received a GED from the Adult Education program while incarcerated at Halawa Correctional Facility in Hawaii in 2003. (*Id.* at 4.) Regarding drugs and alcohol, the PSI explained that Mr. Brown began using alcohol and marijuana at 10 years of age and methamphetamine at 14 years of age. (*Id.*) The PSI further explained that Brown's methamphetamine use became progressive, and he admitted he is addicted to methamphetamine. (*Id.*) And Brown reported he last used the substance during the commission of his instant offense. (*Id.*) Regarding Brown's criminal history, the PSI stated Brown's prior felonies included Assault, Robbery, Possession of a Controlled Substance with Intent to Sell, and Performance of Act or Neglect of Duty in Willful or Wanton Disregard of Safety of Person or Property. (*Id.* at 5-6.) The PSI also stated his criminal history included probation and parole violations and probation revocations. (*Id.* at 7.)

The State withdrew its notice of intent to seek habitual criminal treatment but

concurred with the PSI's recommendation of a sentence of life without possibility of parole. (ECF No. 50-45 at 4-6.) The State argued the attack was unprovoked while Alofaituli slept and was callous because the body was left in a trunk. (*Id.*) The State argued Brown's criminal history includes offenses of increasing violence culminating in the murder. (*Id.*) The State argued that, based on Brown's history, he cannot be managed or supervised. (*Id.*) The State argued, "Every chance that he's gotten throughout the system and throughout his life, he commits another violent offense." (*Id.*)

Defense counsel asked the court to sentence Brown to an aggregate of 21 to 53 years. (*Id.* at 13.) Counsel argued, with that sentence, Brown would not be released until he was in his 60s. (*Id.* at 13-14.) Counsel argued that, when speaking with the jurors after trial, he learned that several of them thought there was no premeditation and wanted to convict Brown of second-degree murder. (*Id.* at 12-13.) Counsel argued that the jury was confused about the felony-murder instruction. (*Id.*)

The sentencing court confirmed it received letters from the defense.[6] (*Id.* at 8.) Counsel argued the letters were provided "to let the court understand who he is and his upbringing." (*Id.*) Counsel said he hoped the court "had a chance to digest those and ultimately consider that who he is" noting Brown indicated he suffered a massive amount of abuse as a child and lacked any sort of parental supervision. (*Id.* at 9.) Counsel explained that Brown's 1998 conviction arose from a bar fight and Brown had participated in amateur and semi-professional fighting and got the best of the opponent. (*Id.*) Counsel explained the 1999 conviction arose because Brown took matters into his own hands when his mother was robbed, assaulted, and severely harmed. (*Id.*) Counsel explained the 2009 jury conviction arose from another bar fight where Brown injured several people. (*Id.* at 10.) Defense counsel argued that, based on Brown's fighting history and massive amounts of abuse, including being beaten by his own mother and having his teeth knocked out as a young child, he wondered whether Brown suffered from chronic

[6] The letters were apparently not filed as part of the state-court record. (*See* ECF Nos. 87 to 89.)

traumatic encephalopathy. (*Id.* at 11.)

Brown explained to the court that he had a childhood of abuse and neglect, and he felt sympathy for Alofaituli's family:

> You know, of all the things I did, you know, in my life, you know, like, I never thought I'd see myself where I was and . . . where I am today. I think of all of it, you know, and I look back at my life . . . I never even had a chance, . . . for like living a normal childhood . . . as soon as I walked . . . as soon as I had teeth my mom would punch every tooth out of my mouth . . . I was treated like crap since I was a ….growing up . . . all I wanted was to be loved, you know. I never had nobody for [sic] love me . . . I never even have [sic], like regular parents, you know, like, I still envy all my friends and stuff, how they live, you know.
>
> And, you know, having your own parent trying to kill you, you know how many times my mom tried to stab me when I was young, I ran away and stuff and, you know, growing up with all this hurt and pain is hard for me, you know, like I didn't know how to . . . live a regular life . . . like as other people do. You know, I always went back to what I—what I was taught as a child, you know. And, you know, that's why I always failed myself, you know. I never really like be [sic] that way in my heart, you know.
>
> [I] had kids and . . . I lost my kids to C.P.S. while doing prison time. And just last week, you know, my son turned 18 and he reached out to me. I thought I'd never see him again, so, you know, and he just wanted me to call him so I call him and we meet—we meet up. You know, like, he was like Dad, what's up, like, I thought you hated me, you know, like, they would hate me because—I mean, I would hate me, you know, for not being there. I never had my real father and stuff like that.
>
> And then I thought—after I spoke to my son, I thought about—I thought about, like, losing him and him being hurt, like how the victim's family feel, you know what I mean, like, I would be devastated, man. My heart would break. I know how they feel now, you know. Like, if something would happen to my son like that or anything would happen to anybody I love like that, man, I wouldn't know how to think, I would be devastated.
>
> So my heart starts breaking, you know. So I understand, you know, I understand. Within my heart, you know, my heart goes out to them and prayers and everything like that and, you know what I mean, like, I'm at the mercy of the Court. And I cannot bring back Fala, but, you know, I just—all I can just pray and hope for closure, you know, for the families and stuff.
>
> That's all I got for saying [sic] now, so.

(*Id.* at 6-8.)

The state court addressed Brown, expressed sympathy for how Brown grew up, but imposed a life sentence without the possibility of parole explaining that, had the State not withdrawn the habitual criminal allegation, the court would have imposed a habitual

criminal sentence because it applies to these kinds of circumstances where an individual uses violence to deal with issues:

> Mr. Brown, I will tell you that, look, I'm incredibly sympathetic to what you've described in terms of what you went through growing up. You know, lots of people deal with difficulties in their childhood. But I'm also a big believer that—that every minute of every hour of every day we make choices as adults, right? And every choice that we make ripples through every other minute and every other hour of every other day. And that's kind of the luggage that we own in our life. We have the responsibility for that.
>
> . . . .
>
> And so when—when—it's just—it's a struggle sometimes when people talk about the things they went through as a child and they don't have that ability to say I don't want to inflict that on anybody else, right? If I—if I suffered physically, I sure don't want to take the pain that I felt from that and inflict it on somebody else, but that's kind of the road you went down. Right? And I'm not saying—your attorney is absolutely appropriate to bring out concerns that he may about chronic traumatic encephalopathy or any other issues.
>
> But the reality is you've kind of, you know, decided as an adult that violence is the manner to deal with whatever issues affect you. Something goes awry in a bar, let's get in a fight; somebody does something to my mom, let's go out and inflict some type of vigilante justice on them; somebody else does something at a bar, let's get in a fight; gotta a guy that maybe hit on my girlfriend or something, I am literally going to go crush his skull with a brick.
>
> So I'll be honest with you, you know, I think it's a rarity, but I would give you a habitual criminal if the State were still seeking that. Because even though it's a rarity, this is the exact type of situation where that applies itself. When somebody is habitually violent, then a society, outside of all of us standing here right now, has the right to believe that the justice system's going to say, protect us, make sure that somebody that can't control themselves in some type of manner in any kind of orderly fashion and can't think ahead enough to say, gee, I'm going to hurt or kill people if I act on what I feel like I'm acting on right now, then, Judge, protect us, you know, protect us from what could potentially happen in that kind of a situation.
>
> And isn't that the type of thing that deserves the higher penalties? And I think that it does. I think that that's exactly the kind of thing that does. Having a bunch of prior felony convictions in and of itself, depending upon the nature of those convictions and a particular case, isn't what should drive habitual criminal. But when it's habitually violent crimes, failed probations, and now here we are having—having murdered somebody, and it's less, and I get the argument, it's less about whether the jury maybe thought it was a first or a second, and I'm talking more about just perpetual violent felonies that have been committed over the course of the last, you know, 12 years since that first conviction occurred in 1999. So I—I gotta tell you, Mr. Brown, I think life without the possibility of parole is an appropriate punishment here.

(*Id.* at 22-24.)

**b. Analysis of Ground 1**

Applying de novo review, the Court concludes Brown has not shown trial counsel's performance was deficient. Trial counsel submitted letters about Brown and his upbringing to the court before sentencing. Counsel argued the letters, along with the remarks of Brown, showed Brown had an abusive childhood. Counsel had concerns Brown may have a brain condition due to the abuse in his childhood and his participation in the fight industry. The PSI contained information about Brown's abusive childhood, his mother's drug addiction and physical abuse, Brown's own drug and alcohol abuse, and Brown's low academic performance. Brown explained to the sentencing court that he had an abusive childhood where his mother knocked out his teeth and, on many occasions, tried to stab him. Brown has not shown that counsel's failure to obtain additional letters or declarations to provide additional support for Brown's tragic personal history fell below an objective standard of reasonableness under the circumstances. *See Strickland*, 466 U.S. at 687-88.

Assuming arguendo that trial counsel's performance was deficient, Brown also fails to establish a substantial, not just conceivable, reasonable probability that he would have received a more favorable sentence but for counsel's failure to obtain Brown's school records or additional letters and declarations about Brown's personal life. The same judge who presided over the trial presided over sentencing. The sentencing court was privy to trial evidence demonstrating Brown lacked remorse for the crimes. Brown did not seek medical assistance even though Alofaituli was still alive after he was struck. Brown exploited the fact that Dunbar and Manhas were afraid of him to enlist their help in placing Alofaituli's body into the trunk of a car. Just after the incident, Brown called Nafus and told her not to tell anyone what happened, and, although he apologized that she had to see what happened, he did not tell her that he was sorry he did it. There was evidence that Brown drove the car with Alofaituli's body in the trunk and left it in another neighborhood for over a week until others discovered it due to the odor from advanced

decomposition. Although the judge expressed sympathy regarding Brown's upbringing and childhood, the judge stated, "the reality is you've kind of, you know, decided as an adult that violence is the manner to deal with whatever issues affect you." (ECF No. 50-45 at 23.) The judge also stated Brown would have been sentenced as a habitual offender had the prosecution requested it. (*Id.*) On de novo review of this claim, the Court concludes Brown fails to demonstrate that, had counsel provided additional mitigation evidence about Brown's childhood and personal life, there is a reasonable probability Brown would have received a more favorable sentencing outcome. *See Strickland*, 466 U.S. at 694. Ground 1 is therefore denied.

**3. Ground 2—IAC—Failure to Object to Admission of Brick**

Brown alleges trial counsel provided ineffective assistance by failing to object to the introduction of a brick into evidence as a demonstrative exhibit. (ECF No. 31 at 25-26.) He argues the brick was inadmissible because there was no evidence it was the murder weapon. (*Id.*) Respondents argue the evidence was clear that the brick presented at trial was not the murder weapon. (ECF No. 78 at 14-15.) They argue Brown fails to demonstrate the prosecution's use of the brick (i.e. raising the brick over his head) was contrary to the evidence presented at trial and Brown was not prejudiced due to the overwhelming evidence of guilt. (*Id.*)

**a. Additional Background**

In closing argument, the prosecutor recounted Nafus's testimony that, before Brown went inside Dunbar's house, he picked up a brick, she told him, "No," and he replied, "What do you mean, no?" (ECF No. 50-41 at 31.) The State argued Dunbar saw Brown with a brick "holding it over his head, standing over the victim" and Alofaituli was "on the ground, bleeding and snoring." (*Id.* at 25-26.) The State conceded Manhas testified he did not see a brick in Brown's hands. (*Id.* at 28.) The State argued Nafus saw Brown return the brick outside in front of the house although she did not know if he returned it to the place from where he took it. (*Id.* at 32.) The State argued "when you hear that a man doesn't like somebody for hitting on his girl, that man gets a brick, walks

inside, the man that he's going after is asleep, and then seconds later, you hear a thud, and then other people walk in and see a man standing with a brick," the jury could draw a reasonable inference that "the brick was slammed down on his head." (*Id.* at 35.) The State argued Dr. Roquero testified "[t]his was done with a blunt force instrument, something that would create a tremendous fracture and that was done in a linear fashion." (*Id.* at 75.) The State argued, "this lateral injury consistent [sic] with a weapon that has a straight edge like a brick." (*Id.* at 36.)

Defense counsel argued in closing that the detective admitted there were "so many different bricks" at Dunbar's residence and decided to "go with that one," but that the brick the detective chose "has no DNA, has no blood on it, nothing to link the defendant to it." (*Id.* at 63-64.) Counsel argued the jury would have the brick and could "hold it, look at it, whatever you want to do," but "there's no blood on the brick" and there was "nothing to link the defendant to it." (*Id.*) Counsel argued that, although the prosecutor "talked about the crushing of a skull" "there's been no testimony of that, there's been no evidence of that, nobody saw what happened." (*Id.*) He argued that, although Nafus said she saw Brown grab a brick, there's no connection between the brick and Brown. (*Id.*) Counsel argued Nafus was "high" "throughout the course of this thing" and there's no corroboration for her story, and the jury must consider "her perceptions, her motivations." (*Id.* at 55, 65.) Counsel argued Dunbar initially told police nothing about Brown having a brick and Manhas never saw Brown with a brick. (*Id.* at. 63.) Counsel argued Dr. Roquero "agreed that he can't testify . . . that this was done by a brick." (*Id.* at 60-61.) Counsel argued Dr. Roquero could not testify that there was dust, or gravel-like substances found on the deceased to correlate the blunt force trauma with a brick. (*Id.* at 61-62.) Counsel argued the State failed to prove the existence of a deadly weapon because although Nafus said there was a brick, that "doesn't mean that it exists or that the one they bring into court is the one." (*Id.*) Counsel argued the DNA evidence did not "link" Brown to the brick that the State used in its argument. (*Id.* at 63-64.) Counsel argued that the brick was irrelevant even though it was in evidence because nothing showed Brown handled it. (*Id.*)

In rebuttal, the State argued, “why isn’t there blood on the brick? Well, the first time that you would hit somebody with an instrument like that, there’s no blood yet. It was the . . . crushing of the skull that created the blood. This is entirely consistent with what the witnesses said.” (*Id.* at 81.) The State argued, “That brick that was brought into this courtroom with four different people’s DNA on it. That didn’t tell you anything? It’s that the defendant couldn’t be excluded from that brick, that this brick that sits outside in front of a home has four different possible sources of DNA. Do we know for sure that that’s the brick? No, but your common sense would tell you that it is.” (*Id.* at 75.) The State argued, “You take a brick of that size and smash it into a human being’s skull with as much force as it would take to crack the skull from front to back in a clean break, so much force that it crushed the man’s—the base of his skull into his spine, that’s a tremendous amount of force.” (*Id.*)

**b. Analysis of Ground 2**

In Nevada, “‘[r]elevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.” NRS § 48.015. “Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.” NRS § 48.035(1). Evidence that is not relevant is not admissible. *See* NRS § 48.025(2).

Defense counsel’s closing argument suggests counsel’s failure to object to the admission of the brick was reasonably strategic. Counsel emphasized none of the witnesses saw what happened to Alofaituli, there was no evidence the brick introduced as evidence was the murder weapon, there was no evidence of blood on that brick or any other brick at the residence, there was no DNA evidence connecting Brown to the brick, and Dr. Roquero saw no gravel or anything that connected the injury to a brick.

Even assuming counsel’s failure to object fell below an objective standard of reasonableness, had counsel objected to the admission of the brick into evidence, there is no substantial reasonable probability the brick would have been excluded or that the

result of the trial would have been different. The brick was relevant as circumstantial evidence. It was taken from the area at Dunbar's house where Nafus saw Brown remove a brick and take it inside the house just before she went inside and found Alofaituli lying in a pool of blood. The brick was thus relevant to show the type of brick that Nafus testified about and that the State contended was the murder weapon. Moreover, Dunbar testified that, when he entered the room and saw Alofaituli lying on the ground in the living room, he saw Brown holding a brick above his head. Finally, the brick was relevant because Dr. Roquero testified that, based on the photographs of Alofaituli's skull (which were admitted into evidence) there was a linear fracture in the left temporoparietal region and another fracture in the frontal region, and the cause of death was blunt force trauma. And Detective Long testified that he attended the autopsy and, according to Dr. Dutra, Alofaituli's head fracture appeared "to be linear, meaning that whatever struck him had a straight edge to it, and it went front to back and then down to the base of the skull." (ECF No. 50-38 at 31-32..) The jury was informed there was no direct evidence the particular brick that was seized was the murder weapon.

Applying de novo review, Ground 2 is denied because the Court concludes defense counsel's failure to object to the admission of the brick did not fall below an objective standard of reasonableness or result in prejudice. *See Strickland*, 466 U.S. at 687-88, 694.

#### 4. Ground 3—Suppression of *Brady* Evidence

Brown alleges, on information and belief, that his rights to Due Process and a Fair Trial under the Fifth, Sixth and Fourteenth Amendments were violated by the State's suppression of immunity given to Dunbar and Manhas. (ECF No. 31 at 26-27.) Respondents contend Brown fails to establish a *Brady* violation. (ECF No. 78 at 15-17.)

The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecutor. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). "[E]vidence favorable to the accused" includes evidence that would help the

defendant impeach a witness. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). A *Brady* violation for failure to disclose evidence contains three components: (1) the evidence at issue is favorable because it is exculpatory or impeaching, (2) the State suppressed that evidence, and (3) the evidence was material or resulted in prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

"Evidence of a deal or promise of lenient treatment in exchange for a witness's testimony against a defendant may constitute evidence that must be disclosed under *Brady* . . .." *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006) (citing *Giglio*, 405 U.S. at 154-55). "The deal or promise need not be express; failure to disclose an agreement or guarantee of leniency 'indicated without making a bald promise' also may violate *Brady.*" *Id.* (quoting *United States v. Butler*, 567 F.2d 885, 888 n.4 (9th Cir. 1978)). "However, in the absence of a promise or deal, a witness's subjective belief that he might receive lenient treatment in exchange for testifying does not render perjurious his testimony that he received no promises that he would benefit from testifying." *Id.* (citing *Williams v. Calderon*, 52 F.3d 1465, 1475 (9th Cir. 1995)).

Before trial, defense counsel moved to compel the State to deliver to the defense "full and complete details regarding the benefits, if any, provided to any witness in the instant matter in exchange for his or her testimony." (ECF No. 50-15 at 8.) At the hearing on the motion, defense counsel informed the trial court he was concerned the witnesses may have received benefits for their testimony because counsel learned one witness met with the prosecutor. (ECF No. 50-19 at 5.) Counsel informed the court that the prosecutor, however, told him that "none of the State's witnesses have been provided any benefits." (*Id.* at 3.) The prosecutor concurred, explaining:

> [THE STATE]: [W]ith regard to the benefits, what I would say is that the way that this crime occurs is that there's a number of people in a residence, the defendant comes in with what we believe to be a brick, and hits the victim over the head, kills him, well, injures him, and then puts him alive into a trunk. There is [sic] people in the house that assist him to put him into the trunk, and I think that's what [defense counsel]'s referring to in terms of benefits.

> Of course, legally, they could probably have been charged with accessory-after-the-fact, but it was always our position that they did so under fear that they had just seen this man basically with his bare hands kill someone. He tells them, Help me put this guy in the trunk. They help him put him in the trunk. So it was never our intention to charge them. I have, of course, met and spoke with both of them, but they did not get a benefit from us by way of us not charging or anything like that. Based upon my reading of the evidence and the detectives from jump, these guys were never going to get charged.
>
> . . . .
>
> Mr. Cristalli represents one of the witnesses, goes by the name Manhas Pardeep Mansur and Mr. Cristali [sic] did meet with us in our office with him and was present while my office, along with the detective, spoke with him. But again, he was not charged from the beginning. He was not going to be charged from the beginning, as you know—

(*Id.* at 4-5.) The trial court asked, "So none of these people were ever told they were going to be charged? They were never charged? There was never any discussion about, you know, testifying to avoid charges?" (*Id.*) And the State replied, "That's right." (*Id.* at 6.)

At trial, defense counsel cross-examined Manhas, who agreed that a detective came to his house and informed him that if he did not give a statement, he could be charged with a crime. (ECF No. 50-37 at 31-34.) Manhas said he told them he would rather have them talk to his attorney. (*Id.*) Manhas was accompanied by an attorney when he gave his first interview with the police on June 10, 2016. (*Id.*) Manhas gave his statement and was never charged with a crime. (*Id.*) On cross-examination of Detective Long, defense counsel elicited that it was Long's decision not to arrest Dunbar, but that Dunbar assisted in the investigation. (ECF No. 50-38 at 80.) Counsel asked Long, "Did you at any point in time or any of the officers under your command at any time explain to Manhas that if he did not give a statement, he could be arrested in connection with this case?" (*Id.* at 93-94.) Long replied, "If we located anything that showed that he took participation in this case, yes, I could arrest him. I don't know until I talk to him." (*Id.*) Counsel then asked, "Okay, so—but did you ever say, if you right now don't talk to me, you're going to be arrested? You told him that?" Long replied, "No. I said, you can be arrested, it can happen, because I don't know what you know." (*Id.*) Nafus testified that the State paid for her trip to testify, including her airfare, lodging, and a stipend for food. (ECF No. 50-36 at 131.)

Applying de novo review, the Court concludes Brown fails to demonstrate a *Brady* violation. The State confirmed it had not offered any benefits to any of the witnesses. The jury was made aware through direct and cross-examination that Dunbar and Manhas were not charged for their participation in covering up the offenses, and that the State paid for Nafus to travel to testify. The record belies the claim that the trial witnesses received undisclosed benefits in exchange for their testimony. Ground 3 is therefore denied.

**5. Ground 4—IAC—Failure to Investigate Witness Benefits**

Brown alleges, on information and belief, that trial counsel rendered deficient performance by failing to investigate whether witnesses Steve and Manhas received immunity from prosecution in exchange for their testimony. (ECF No. 31 at 27-28.) As explained in Ground 3, the state-court record establishes defense counsel investigated whether any of the State's witnesses received any benefits in exchange for their testimony by moving to compel the state to divulge such benefits. And the prosecutor informed defense counsel and the trial court that the witnesses received no undisclosed benefits. Ground 4 is denied because it lacks merit. *See Strickland*, 466 U.S. at 687-88, 694.

**6. Ground 5—IAC—Failure to Object to Testimony**

Brown alleges trial counsel provided ineffective assistance by failing to object that Dunbar and Manhas would incriminate themselves if they were permitted to testify. (ECF No. 31 at 28-29.) He claims that, had counsel objected, the court would have appointed counsel to represent the witnesses, the witnesses would have been advised against incriminating themselves, and the witnesses would not have testified against Brown. (*Id.*) Respondents contend, among other things, counsel was not ineffective because counsel lacked standing to assert the rights of the witnesses. (ECF No. 78 at 18-20.)

"The immunity provided by the 5th Amendment against self-incrimination is personal to the witness himself," and "not that of the party on trial." *McAlister v. Henkel*, 201 U.S. 90, 91 (1906). Because the right against self-incrimination is personal to a

witness, only the witness may assert or waive it. *See United States v. Terabelian*, 105 F.4th 1207, 1221 (9th Cir. 2024); *see also*, *e.g.*, *United States v. Le Pera*, 443 F.2d 810, 812 (9th Cir. 1971) (holding trial court did not err in denying motion to suppress testimony of coconspirators as defendant lacked standing to assert the witnesses' privilege); *Bowman v. United States*, 350 F.2d 913, 915-16 (9th Cir. 1965) (explaining a defendant cannot complain if a witness fails to assert the privilege).

Neither Brown nor his trial counsel had standing to assert the Fifth Amendment privilege on behalf of Dunbar or Manhas. Accordingly, counsel's failure to object to their testimony on the grounds that they would be testifying in violation of their Fifth Amendment privilege against self-incrimination, did not fall below an objective standard of reasonableness or result in prejudice to Brown. *See Strickland*, 466 U.S. at 687-88, 694. Ground 5 is therefore denied.

**7. Ground 9—IAC—Failure to Challenge Jurors for Cause**

Brown alleges trial counsel provided ineffective assistance by failing to move to strike six venirepersons for cause. (ECF No. 31 at 35-37.) Respondents argue Brown fails to show any of those jurors were biased or that, had his counsel moved to strike the jurors for cause, the outcome would have been different. (ECF No. 78 at 29-30.)

"The Sixth Amendment guarantees criminal defendants a fair trial, which assumes in a case tried to a jury 'a jury capable and willing to decide the case solely on the evidence before it.'" *Fields v. Woodford*, 309 F.3d 1095, 1103 (9th Cir. 2002) (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) and quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). "A defendant is denied the right to an impartial jury even if only one juror is biased or prejudiced." *Id.* (citing *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990)). "The Supreme Court has suggested that the relevant test for determining whether a juror is biased is 'whether the juror[ ] . . . had such fixed opinions that [he] could not judge impartially the guilt of the defendant.'" *United States v. Quintero-Barraza*, 78 F.3d 1344, 1349 (9th Cir. 1995) (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)).

In Nevada, a juror may be challenged "for disqualification or for any cause or favor

which would prevent the juror from adjudicating the facts fairly." NRS § 175.036(1). Challenges for cause may also be taken on one or more of the following grounds:

> (a) A want of any of the qualifications prescribed by statute to render a person competent as a juror.
>
> (b) Consanguinity or affinity within the third degree to either party.
>
> (c) Standing in the relation of debtor and creditor, guardian and protected person, master and servant, employer and clerk, or principal and agent, to either party, being a member of the family of either party or a partner, or united in business with either party, or being security on any bond or obligation for either party.
>
> (d) Having served as a juror or been a witness on a previous trial between the same parties for the same cause of action or being then a witness therein.
>
> (e) Interest on the part of the juror in the event of the action, or in the main question involved in the action, except the interest of the juror as a member or citizen of a municipal corporation.
>
> (f) Having formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved therein, but the reading of newspaper accounts of the subject matter before the court shall not disqualify a juror either for bias or opinion.
>
> (g) The existence of a state of mind in the juror evincing enmity against or bias to either party.

NRS § 16.050(1).

As detailed below, Brown has not shown counsel's failure to move to strike for cause any of the six venirepersons fell below an objective standard of reasonableness, a reasonable probability such motions would have been granted, or a reasonable probability the result of the trial would have been different, had counsel done so. *See Strickland*, 466 U.S. at 687-88, 694.

**a. Juror 131 (Murone)**

Brown alleges that, although Murone said he could keep an open mind about the case, his assertion was implausible because he was a witness to a murder and played a significant role in the criminal process. (ECF No. 83 at 45-46.) He claims counsel should have moved to strike Murone for cause and he was prejudiced because Murone served on the jury despite his inability to act impartially. (*Id.*)

In voir dire, Murone explained that he was once a witness in an unrelated case. (ECF No. 50-34 at 113, 122-25.) Around midnight one night, he heard people fighting outside his window and got up to tell them to "shut up." (*Id.*) He saw a person heading towards a person in a car and thought they were going to fight. (*Id.*) As he left to stop it, he heard gunfire, ducked down, and called 911. (*Id.*) He ultimately testified to the grand jury and at trial and his testimony lasted only a few minutes. (*Id.*)

Murone confirmed that, were he chosen as a juror in Brown's case, he would treat witnesses who are police officers "the same" as other witnesses. (*Id.* at 125.) When asked whether he could keep an open mind about the case and not decide any issue until it was submitted to him for deliberations, he replied, "Yes. Everybody is innocent until proven guilty." (*Id.*) When asked why he wanted to be a juror, Murone replied: "I believe I can fill that spot and be a fair juror to both sides of the parties." (*Id.* at 142-43.) When asked whether he would consider the statutory forms of punishment if called to preside over the sentencing, Murone responded, "I can consider the three options. But to me, until he's proven guilty, I don't want to really put that thought in my head." (*Id.* at 135-36.) Defense counsel later asked whether Murone had formulated any opinions about sentence, and Murone replied, "I don't want to, because to me then you're already putting something in your head that he's guilty. You can't do that." (*Id.* at 150-51.)

Brown has presented no evidence that Murone was a biased juror or any reasonable and successful basis for counsel to have objected to strike Murone for cause. *See* NRS § 16.050(1); 175.036(1). Brown has not demonstrated Murone's responses to questions in voir dire were implausible or any basis to conclude Murone's statements were false or that he was biased against Brown. Although, in a completely unrelated incident, Murone once heard a shot that ultimately killed someone, and he testified about it, his testimony in that case was brief. Accordingly, Brown has neither demonstrated counsel's performance was deficient nor any reasonable probability a motion to strike Murone for cause would have been granted, nor a reasonable probability that, but for counsel's failure to move to strike, the result of the trial would have been different.

**b. Juror 43 (Rogers)**

Rogers's father worked for Nevada Highway Patrol, and his brother had just retired from the Las Vegas Metropolitan Police Department in Laughlin. (ECF No. 50-31 at 43, 82-83, 186-188.) Brown argues Rogers's close familial relationships with law enforcement made him more likely-whether consciously or subconsciously-to trust and believe law enforcement that testified in Shawn's case. (ECF No. 83 at 46.) Rogers, however, stated he was "raised by a policeman" and understood "that they're people, they make mistakes, so it's going to have to be the evidence." (*Id.*) Rogers stated he would "especially" want someone like him to serve on his jury if he was charged with murder because, despite the fact that his friends and family were in law enforcement, he had "been around a long time" and had "seen enough to know that it has to be the truth; otherwise, it doesn't hold water." (*Id.*) He confirmed that he would hear all the evidence before making a determination. (*Id.*)

The Ninth Circuit has established that bias and prejudice will not be presumed from the fact that a juror is engaged in law enforcement work or has a family member in law enforcement. *See United States v. James*, 453 F.2d 27, 28 (9th Cir. 1971). An objectively reasonable attorney would determine that, given Rogers's response to voir dire, there was no basis to challenge Rogers for bias. Brown has neither demonstrated there is a reasonable probability a motion to strike Rogers for cause would have been granted nor a reasonable probability the result of the trial would have been different but for counsel's failure to move to strike Rogers.

**c. Juror 9 (Whitehead)**

Brown argues counsel was ineffective for failing to move to strike Whitehead for cause because, although Whitehead said she could be fair and impartial, her status as a crime victim made it more likely she would find persuasive inculpatory evidence against Brown. (ECF No. 31 at 36.)

Whitehead was a victim of two residential burglaries and domestic violence; but confirmed she believed she could be fair to the defendant and the State. (ECF No. 50-31

at 104-105, 159-161.) Defense counsel questioned Whitehead about her thoughts on potential penalties if someone was convicted of first-degree murder, and Whitehead responded that "it's too early" and she had given penalty no consideration. (ECF No. 50-34 at 72-73.) She said she gave it no consideration because she did not know whether there would be a conviction as she had heard no evidence. (*Id.* at 73-74.)

The mere fact that a prospective juror has prior experience as a crime victim does not automatically establish bias. And Brown has neither demonstrated Whitehead was biased, nor a reasonable probability that a motion to strike Whitehead for cause would have been granted, nor a reasonable probability the result of the trial would have been different but for counsel's failure to move to strike Whitehead for cause.

**d. Juror 16 (Fuertes)**

Brown argues counsel should have moved to strike Fuertes for cause because, although Fuertes said he could be fair to both sides, his status as a crime victim made him more likely to side with the government. (ECF No. 31 at 36.) Three years before Brown's trial, Fuertes was in the middle of a move of his business inventory when "pretty much everything" was stolen. (ECF No. 50-31 at 103-04, 161-63.) Although he filed a police report, there was no closure in his case. (*Id.*) When asked whether anything about that experience would cause him to be unfair to either side in Brown's case, he replied, "I don't think so." (*Id.*) Brown has neither demonstrated Fuertes was biased against Brown, nor a reasonable likelihood a motion to strike for cause would have been granted, nor a reasonable probability the result of the trial would have been different but for counsel's failure to so move.

**e. Juror 29 (Lightfowler)**

Brown claims counsel was ineffective for failing to move to strike Lightfowler for cause because Lightfowler's status as a crime victim made him more likely to sympathize with the government. (ECF No. 31 at 36.) Lightfowler disclosed he had an estranged son who was in prison in North Dakota on and off for 15 years, for crimes involving forged checks, forged credit cards, and stealing his mother's credit card. (ECF No. 50-31 at 118-

19.) Lightfowler also confirmed he had no concerns about sitting as a juror in this case despite being a victim of residential burglary and embezzlement by one of his employees. (*Id.* at 108-11, 171-73.) Brown has neither demonstrated Lightfowler was biased, nor a reasonable probability a motion to strike Lightfowler for cause would have been granted, nor a reasonable probability the result of the trial would have been different, but for counsel's failure to do so.

**f. Juror 45 (Mills)**

Brown alleges trial counsel was ineffective for failing to excuse Mills for cause on the ground he was biased because Brown chose not to testify. (ECF No. 31 at 37.)

During jury selection, defense counsel explained the Constitutions of the United States and Nevada say a defendant can't be compelled to testify and that it won't be held against a defendant if he does not testify. (ECF No. 50-34 at 77-79.) Defense counsel asked the venire whether they would like to hear from the defendant and would be able to follow the judge's instructions on that and whether any of them felt "sitting on that side of the table that you've got to get up there and give your side of it?" (*Id.*) Mills replied, "Well, I'd want to." (*Id.*) Mills explained, "Well, if I was up there, I'd be telling the truth, I was at In-N-Out Burger with him you know. I—I or I wasn't there. I would say I was not there." (*Id.*) Defense counsel asked, "do you have this expectation in your mind already that he's got to get up there and testify, if I don't hear from him, I'm going to hold that against him?" (*Id.*) Mills replied, "I'm not going to hold it against him, but if he wasn't there, well, I would say I wasn't there." (*Id.*)

Brown has not established counsel's performance was deficient as a reasonable attorney could conclude that a motion to strike for bias would be denied given that Mills stated he would not hold it against Brown if Brown chose not to testify.

For the forgoing reasons, the Court, applying de novo review, denies Ground 9.

**8. Ground 10—Confrontation Clause**

Brown alleges trial counsel was ineffective for failing to object to the admission of Dr. Roquero's testimony because, under then existing controlling Supreme Court

authority, Roquero's testimony was inadmissible given that he did not perform the autopsy and Brown was not given the opportunity to cross-examine the coroner who conducted the autopsy (Dr. Dutra). (ECF No. 31 at 37-38.) Respondents contend Brown fails to establish counsel was ineffective. (ECF No. 78 at 31-32.)

The State noticed its intent to call Dr. Timothy Dutra of the Clark County Coroner's Office to testify regarding "the cause and manner of death" of Alofaituli. (ECF No. 50-13 at 2.) During trial, defense counsel became aware the State would not call Dutra but would instead call a "substitute." (ECF No. 50-36 at 257.)

At trial, Dr. Roquero testified he was employed with the Clark County Coroner's Office, but that Dutra, who was no longer employed there, had performed Alofaituli's autopsy. (ECF No. 50-37 at 102-104, 124-125.) Roquero reviewed Dutra's autopsy report, crime scene and autopsy photographs, the postmortem toxicology report of a certified forensic toxicology laboratory, and the investigator's report. (*Id.*) Based on his review of all the materials, Roquero drew his own conclusions. (*Id.*) Roquero viewed photographs and testified to what he observed in them regarding the condition of the body and the steps the medical examiner took to expose the findings shown in the photographs. (*Id.* at 106-33.) Roquero testified that, after a review of all Dutra's material, it was Roquero's opinion Alofaituli died from blunt force trauma to the head and the manner of death was homicide. (*Id.*) On cross-examination, Roquero testified Dutra was still alive and practicing in another state. (*Id.* at 124-25.) Roquero admitted he reviewed only paper documents and photographs, was never inside the medical office with the body or skull, and never physically looked at the skull as the photographs were taken. (*Id.* at 126.)

The Sixth Amendment's Confrontation Clause "bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity' to cross-examine her." *Smith v. Arizona*, 602 U.S. 779, 783 (2024) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). Thus, for example, in the absence of prior cross-examination of an absent laboratory analyst, the prosecutor cannot introduce the absent laboratory analyst's testimonial out-of-court

statements to prove the results of her forensic testing. *Id.* (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307 (2009)). *See also*, *e.g.*, *Bullcoming v. New Mexico*, 564 U.S. 647, 657-63 (2011) (holding Confrontation Clause did not permit the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification). In 2012, the Supreme Court ruled the Sixth Amendment Confrontation Clause was not violated by the introduction of out-of-court statements related by an expert at trial solely for the purpose of explaining the assumptions on which their opinion rested because they were not offered for their truth and thus fell outside the scope of the Confrontation Clause. *See Williams v. Illinois*, 567 U.S. 50, 58 (2012).[7]

The United States Supreme Court has not ruled that autopsy reports are testimonial within the meaning of *Crawford, Melendez-Diaz*, and *Bullcoming*. *See Williams*, 567 U.S. at 84 (recognizing in *Melendez-Diaz* and *Bullcoming*, the Supreme Court "did not hold that all forensic reports fall into the same category . . . the reports in those cases ran afoul to the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial."). *See also Meras v. Sisto*, 676 F.3d 1184 (9th Cir. 2012) (explaining that *Crawford* did not clearly establish that autopsy reports are testimonial). Moreover, at the time of Brown's trial in 2018, the Supreme Court had not clearly established the admission of out-of-court statements relied on by an expert violated the Confrontation Clause. *See, e.g., Barba v. Montgomery*, 723 F. App'x 431, 432 (9th Cir. 2018); *Hill v. Virga*, 588 F. App'x 723, 724 (9th Cir. 2014) ("The Supreme Court has not clearly established that the admission of out-of-court statements relied on by an expert violates the Confrontation Clause.").

---

[7] In 2024, the Supreme Court acknowledged in Smith that its failure to produce a majority opinion in *Williams* had sown "confusion in courts across the country about the Confrontation Clause's application to expert opinion testimony." *Smith*, 602 U.S. at 789 (quoting *Stuart v. Alabama*, 586 U.S. 1026, 1026-28 (2018) (GORSUCH, J., dissenting from denial of certiorari).

Applying de novo review, Brown has not established his Confrontation Clause rights were violated by the introduction of Dr. Roquero's testimony. Accordingly, Brown has not established that trial counsel's failure to object constitutes ineffective assistance under *Strickland*. Ground 10 is therefore denied.

**9. Ground 11—Factual innocence**

Brown alleges he is factually innocent of the murder charge and imprisoned in violation of the Fifth and Fourteenth Amendments because Nafus, Dunbar, and Manhas failed to intervene and could have saved Alofaituli's life. (ECF No. 31 at 38-39.) Respondents contend Ground 11 is not cognizable because neither the United States Supreme Court nor the Ninth Circuit Court of Appeals has determined a freestanding claim of actual innocence is cognizable on federal habeas review, and alternatively, Brown fails to establish factual innocence because his arguments place him at the scene of the crime scene and fail to preclude any possibility of guilt. (ECF No. 78 at 33-34.)

The Supreme Court has not yet resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993)). However, the Supreme Court has indicated that even assuming a freestanding actual-innocence claim is cognizable, for the claim to be successful in a capital case, a petitioner would be required to show "a truly persuasive demonstration of 'actual innocence.'" *Herrera*, 506 U.S. at 417. *See also, e.g., House v. Bell*, 547 U.S. 518, 555 (2006) (rejecting freestanding actual innocence claim even though the petitioner had "cast considerable doubt on his guilt") (citing *Schlup v. Delo*, 513 U.S. 298 (1995)); *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000) (rejecting a freestanding actual innocence claim even though the petitioner's new evidence "certainly cast doubt on his conviction.").

Brown's argument that he is innocent because Nafus, Dunbar, or Manhas, could have dialed 911 to save Alofaituli's life, does not present convincing proof of Brown's innocence. That evidence does not refute the evidence supporting Brown's guilt for the offenses. Given the evidence against Brown, and that his arguments for innocence fail to

in any way exonerate him, Brown fails to establish any basis to conclude he can satisfy proof of innocence. Ground 11 is denied.

### 10. Ground 12—IAC—Call Forensic Toxicologist/Chemist

Brown alleges trial counsel provided ineffective assistance by failing to call a forensic toxicologist/chemist to testify at trial even though counsel informed the venire that he might call one and argued for the opportunity to do so during trial. (ECF No. 31 at 39.) He argues that if a toxicologist had testified about the amount of methamphetamine in Alofaituli's system, the jury might have concluded that he died from methamphetamine use. (ECF No. 83 at 48-49.) Respondents contend the record shows neither deficient performance nor resulting prejudice. (ECF No. 78 at 34-35.)

Before trial, counsel provided notice of the intent to call Dan R. Berkible as an expert. (ECF No. 50-12.) Defense counsel stated he intended to call an expert to discuss methamphetamine use and effects. (ECF No. 50-1 at 28.) The trial court stated it would allow testimony regarding the effects of methamphetamine; however, the victim's toxicology report was not yet relevant. (*Id.*) When counsel introduced himself to the venire, he indicated he would "maybe call a forensic toxicologist/chemist" named Berkible. (ECF No. 50-31 at 11.)

At a bench conference after jury selection, defense counsel explained that he noticed a toxicology expert but had not said whether he intended to call the expert. (ECF No. 50-34 at 222.) Counsel argued the expert's testimony was relevant to the perceptions of the three eyewitnesses who had used methamphetamine at the time of the offenses, and because Dr. Dutra had opined that, but for the skull fracture, the cause of death would have been an overdose due to a toxic level of methamphetamine found in Alofaituli's blood system. (*Id.* at 219-22.) Counsel argued the credibility of the three eyewitnesses was at issue, and stated, "If I think methamphetamine usage and its affects needs to be expanded upon, then I believe I have the right to call that expert . . .." (*Id.* at 222-23.) The court ruled that "unless there's somebody that says he wasn't just asleep, then how [Brown] would have acted, based on methamphetamine use, isn't relevant." (*Id.* at 224-

25.) The trial court advised, "I would stay away from anything about the decedent's intoxication level until such time as it's become relevant by other evidence." (*Id.* at 230.)

During trial, defense counsel confirmed he understood the trial court would permit him to call the toxicology expert to talk about the effects of methamphetamine on the perceptions of the witnesses. (ECF No. 50-36 at 249-52.) And the trial court confirmed the defense could ask their expert whether it was unlikely that Alofaituli was sleeping given the amount of methamphetamine in his system. (*Id.* at 254-55.) The court also ruled the defense expert could testify that, as a separate and distinct cause of death issue, the amount of methamphetamine in Alofaituli's system would have killed him. (*Id.* at 260.) Defense counsel, however, replied, "I noticed an expert that came up with any [sic] alternate conclusion." (*Id.*) The trial court denied defense counsel's request to ask the State's coroner about the results of Alofaituli's toxicology report unless the State opened the door during the coroner's direct examination. (*Id.* at 261.) The State indicated it would not ask the coroner about Alofaituli's toxicology report because the methamphetamine use did not contribute to the cause of death. (*Id.* at 263.) On cross-examination, Dr. Roquero testified there was nothing in Dutra's reports about whether the injury occurred while Alofaituli was asleep. (ECF No. 50-37 at 131-32.) In closing, defense counsel argued no one saw what happened to Alofaituli, that Nafus, Dunbar, and Manhas, were each under the influence of methamphetamine, and the jury should think about Nafus's "perceptions" because she was "high." (ECF No. 50-41 at 53, 55-56, 65.)

Brown has not met his burden to show that trial counsel was ineffective for failing to call a toxicology expert. *See Strickland*, 466 U.S. at 687-88. The witnesses testified to their methamphetamine use on the morning of the incident. Although the trial court permitted the defense to call an expert to testify about how methamphetamine affected the witnesses' perceptions, counsel instead argued the witnesses were "high" on methamphetamine at the time of the incident. Counsel's strategy was reasonable as the jury was instructed that it could rely upon reasonable inferences from the evidence which it felt were justified considering common experience. And counsel was not ineffective for

failing to call the defense expert to testify that Alofaituli died from a methamphetamine overdose because trial counsel indicated the expert he hired concluded otherwise. Ground 12 is denied. *See Strickland*, 466 U.S. at 687-88, 694.

**11. Ground 13—IAC—Accomplice Testimony Instruction**

Brown alleges counsel provided ineffective assistance by opposing the trial court's proposed jury instruction which could have taken the following form: "You should view with distrust the testimony of any witness whom you find to be an accomplice." (ECF No. 31 at 40.) Respondents contend defense counsel was not ineffective. (ECF No. 78 at 35-36.)

During the discussion of jury instructions at trial, the trial court thought an accomplice instruction was necessary, but defense counsel affirmatively requested the court not provide one:

> THE COURT: [A]nd then, the other thing that I added to the end was, you know, based on the state of the evidence, this is less about, you know, people being subjected to arrest for murder. I mean, I guess, arguably, somebody could say they could be arrested for accessory after the fact, but my concern was that really what they were kind of saying, that they were involved in the Kidnapping portion of things, which kind of makes them accomplices. And I understand why Detective Long is saying I didn't want to arrest them, but I think an accomplice instruction is necessary. So I don't know what anybody's thoughts are on that.
>
> . . . .
>
> [DEFENSE COUNSEL]: I don't necessarily think we need it. I mean, I think that they can judge the witnesses and their—I think the credibility instruction ultimately addresses their motivations and their interests in their testimony. And I think it's been pretty clear—I think the State made it clear that [Dunbar] wasn't arrested in connection with this case, only on the warrant.
>
> . . . .
>
> I think that—nobody else was arrested. I think the evidence is there. I think the jury is free to draw their conclusions on whether or not—what accomplice liability could be or was not. I mean, I just—I don't think it's overly necessary.
>
> . . . .
>
> THE COURT: It's not overly necessary, or are you affirmatively saying you guys don't want it?
>
> [DEFENSE COUNSEL]: I'm affirmatively saying that I do not—I don't want another instruction about accomplice liability inside.

> THE COURT: Okay. Well, not another one about it. You don't want—
>
> [DEFENSE COUNSEL]: Just I don't want one at all.
>
> THE COURT: You don't want accomplice at all?
>
> [DEFENSE COUNSEL]: Right.
>
> THE COURT: Okay. State?
>
> [THE STATE]: Yeah. I don't think that we need any accomplice stuff either, to be honest, Judge.

(ECF No. 50-38 at 115-17.)

An accomplice is defined as "one liable to prosecution for the identical offense charged against the defendant, or who is 'culpably implicated in, or unlawfully cooperates, aids or abets in the commission of the crime charged.'" NRS § 175.291(2). *See also Orfield v. State*, 771 P.2d 148, 149 (Nev. 1989). "A person is not an accomplice simply because he or she happened to be present when the crime was committed." *Id.*

NRS § 175.291(1) provides for corroboration of accomplice testimony:

> A conviction shall not be had on the testimony of an accomplice unless the accomplice is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof.

"The district court is required to give a cautionary jury instruction when an accomplice's testimony is uncorroborated." *See Gonzalez v. State*, 366 P.3d 680, 686 (Nev. 2015). "If the testimony is corroborated, a cautionary instruction is favored, but failure to grant it is not reversible error." *Id.* "An accomplice-distrust instruction 'advises the jury that it should view as suspect incriminating testimony given by those who are liable to prosecution for the identical charged offense as the accused.'" *Id.*

Here, defense counsel's statement that he was "affirmatively saying" he did not want an instruction on accomplice liability is an indication counsel's decision was strategic. Dunbar and Manhas were arguably accomplices based on the Kidnapping charge. NRS § 175.291(2); *Orfield*, 771 P.2d at 149. The State had to prove Alofaituli was

alive at the time the Kidnapping was initiated, i.e., when he was moved to the trunk of the car. ECF No. 50-40 at 31. While Dunbar testified Alofaituli was still breathing at that time, Manhas testified he was not breathing. Reasonable trial counsel could conclude an accomplice instruction was not desirable because it tacitly admitted Brown committed a crime with Dunbar and Alofaituli, the general jury instruction regarding witness credibility was adequate, and an accomplice instruction might detract from counsel's argument that the State failed to prove Kidnapping. The record also establishes there is no reasonable probability the result of the trial would have been different but for counsel's failure to accept an accomplice instruction as the jury delivered an acquittal for Kidnapping. Ground 13 is denied because the record belies the claim that counsel's rejection of the accomplice instruction constitutes ineffective assistance. *See Strickland*, 466 U.S. at 687-88, 694.

**12. Ground 14—Cumulative Trial Error**

Brown alleges cumulative trial errors violated his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 31 at 40.)

"[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Id. See also Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) ("We have granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case."). A cumulative error claim may be exhausted to the extent the underlying individual claims of error are exhausted. *See, e.g., Cash v. Johnson*, No. 2:22-CV-01345-RFB-DJA, 2026 WL 867974, at *6 (D. Nev. Mar. 30, 2026).

On direct appeal, the Nevada Court of Appeals held: "Brown also argues for the first time in his reply brief that cumulative error warrants reversal. Reply briefs are 'limited to answering any new matter set forth in the opposing brief.' Nev. R. App. P. 28(c).

Therefore, we do not consider this argument." (ECF No. 61-46 at 6 n.4.)

Assuming this court were to apply de novo review of Brown's cumulative error argument to all Brown's claims, there are no errors to cumulate. *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a)."). Ground 14 is therefore denied.

**13. IAC Claims as a Whole**

"Although IAC claims are examined separately to determine whether counsel was deficient, the purpose of the Sixth Amendment's guarantee to counsel is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 692. The Ninth Circuit has held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) (emphasis in original) (quoting, in part, *Strickland*, 466 U.S. at 690); *see also Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("We must analyze each of his claims separately to determine whether his counsel was deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)). Here, considering defense counsel's conduct as a whole, Brown has not demonstrated counsel's performance was constitutionally inadequate.

**V. CERTIFICATE OF APPEALABILITY**

This is a final order adverse to Brown. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only

when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983), *superseded by statute as stated in Slack*, 529 U.S. 473). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.* The rulings for Grounds 1, 6, 7, and 12 meet the *Slack* standard. Accordingly, the Court will issue a COA as to these grounds.

## VI. CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that the Motion for Evidentiary Hearing (ECF No. 84) is denied.

It is further ordered that the Amended Petition (ECF No. 3) is denied on the merits.

It is further ordered that a certificate of appealability is granted for Grounds 1, 6, 7, and 12 of the Amended Petition, and a certificate of appealability is denied for all other Grounds.

It is further ordered that the Clerk of Court substitute Jeremy Bean for respondent Gittere, enter judgment accordingly, and close this case.

DATED THIS 28th Day of September 2026.



MIRANDA M. DU
UNITED STATES DISTRICT JUDGE